# 16-3302-cv

## 𝕌nited 𝕊tates 𝕮ourt of 𝔸ppeals for the 𝕊econd 𝕮ircuit

XUEDAN WANG, on behalf of herself and all others
similarly situated, MATTHEW JORDAN WAGSTER, ERIN E.
SPENCER, on behalf of herself and all others similarly
situated, ALEXANDRA RAPPAPORT, SARAH WHEELS,                    *Plaintiffs-Appellants*,

JESSICA ANN BEST, PAUL VANCE, COURTNEY HOLT, JANET
E. GLAZIER, REBECCA E. DIXON, ERIN D. SULLIVAN,
CARLY ROCKWELL, DANA LYNN VOGEL, ELIZABETH
MANCINI, STEPHANIE LAUREN SKORKA, CAITLIN LESZUK,        *Plaintiffs*,

v.

THE HEARST CORPORATION,                                        *Defendant-Appellee.*

On Appeal from the United States District Court
for the Southern District of New York

**BRIEF OF AMICI CURIAE AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES; COMMUNICATIONS
WORKERS OF AMERICA, AFL-CIO; ECONOMIC POLICY INSTITUTE;
INTERN WORKER ALLIANCE; NATIONAL EMPLOYMENT LAWYERS
ASSOCIATION; NATIONAL EMPLOYMENT LAW PROJECT; SERVICE
EMPLOYEES INTERNATIONAL UNION; UNITED FOOD AND
COMMERCIAL WORKERS INTERNATIONAL UNION; WRITERS
GUILD OF AMERICA, EAST, AFL-CIO; PROFESSOR SCOTT MOSS;
ROSS PERLIN; AND PROFESSOR DAVID C. YAMADA
IN SUPPORT OF PLAINTIFFS-APPELLANTS**

Rachel Geman
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor ▪ New York, NY 10013-1413
Telephone: (212) 355-9500 ▪ Facsimile: (212) 355-9592
*Attorney for Amici Curiae*

## **RULE 26.1(a) CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the corporate amici curiae who submit this brief hereby disclose that none of them has any parent corporation and that no publicly-held corporation owns 10% or more of the stock of any corporate amicus.

## **TABLE OF CONTENTS**

RULE 26.1(a) CORPORATE DISCLOSURE STATEMENT ................................i

INTERESTS OF AMICI CURIAE..........................................................1

SUMMARY OF ARGUMENT ............................................................5

ARGUMENT ....................................................................................7

I. The Remedial Nature of the FLSA Warrants an Expansive Interpretation of Its Worker-Protective Provisions.........................................................7

II. An Overbroad Definition of "Internships" Has Grave, Wide-Ranging Financial and Personal Impact on Vulnerable Workers. ...................................9

    A. Workers who are denied "employee" status often suffer immediate and ongoing economic struggles. ...........................................................9

    B. Educational institutions have not imposed the kinds of oversight that might mitigate inequities inherent in unpaid internships. ...........................12

    C. The proliferation of unpaid work tends to burden poorer families and ultimately also federal, state, and local governments..................................16

    D. The proliferation of unpaid work undermines all workers' ability to seek wages commensurate with the value of their work. .....................................18

III. An Overbroad Reading of This Court's Prior Rulings Could Improperly Expand the Use of Unpaid Labor. ......................................................19

    A. Employers are incentivized to cut labor costs by wrongly classifying employees as interns. .................................................................19

    B. Employers are also incentivized to misclassify employees as, for example, overtime-exempt or independent contractors. .............................24

    C. A decision from this Court that accounts for the economic realities of workers can demonstrate the proper scope of *Glatt*. ...................................26

CONCLUSION .................................................................................27

CERTIFICATE OF COMPLIANCE.......................................................29

# TABLE OF AUTHORITIES

**Page**

## Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...................................................................................27

*Anderson v. Mt. Clemens Pottery Co.*,
328 U.S. 680 (1946) .....................................................................................7

*Arnold v. Ben Kanowsky, Inc.*,
361 U.S. 388 (1960) .....................................................................................9

*Bachayeva v. Americare Certified Special Servs., Inc.*,
No. 12-CV-1466 RRM, 2013 WL 1171741 (E.D.N.Y. Mar. 20, 2013) ...............9

*Barfield v. N.Y.C. Health and Hosps. Corp.*,
537 F.3d 132 (2d Cir. 2008) ................................................................8, 26

*Barrentine v. Ark. Best Freight Sys., Inc.*,
450 U.S. 728 (1981) .....................................................................................7

*Brooklyn Sav. Bank v. O'Neil*,
324 U.S. 697 (1945) ...................................................................................10

*Brown v. Nationscredit Commercial Corp.*,
No. 3:99-CV-592-EBB, 2000 WL 887593 (D. Conn. June 26, 2000)................10

*Carrillo v. Schneider Logistics, Inc.*,
823 F. Supp. 2d 1040 (C.D. Cal. 2011),
*aff'd*, 501 F. App'x 713 (9th Cir. 2012 Mem. Disp.) .........................................22

*Carter v. Dutchess Cmty. Coll.*,
735 F.2d 8 (2d Cir. 1984) .............................................................................8

*Falk v. Brennan*,
414 U.S. 190 (1973) .....................................................................................8

*Glatt v. Fox Searchlight Pictures, Inc.*,
811 F.3d 528 (2d Cir. 2015) ............................................... 6, 16, 23, 26

*Graziadio v. Culinary Inst. of Am.*,
817 F.3d 415 (2d Cir. 2016) .......................................................................27

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Greathouse v. JHS Sec. Inc.*,
 784 F.3d 105 (2d Cir. 2015) ...................................................................7

*Gulino v. N.Y. State Educ. Dep't*,
 460 F.3d 361 (2d Cir. 2006) .................................................................10

*Irizarry v. Catsimatidis*,
 722 F.3d 99 (2d Cir. 2013) .....................................................................9

*Kasten v. Saint-Gobain Performance Plastics Corp.*,
 563 U.S. 1 (2011) ...............................................................................7, 8

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
 715 F.3d 102 (2d Cir. 2013) .................................................................27

*Mitchell v. Lublin, McGaughy & Assocs.*,
 358 U.S. 207 (1959) ...............................................................................7

*Narayan v. EGL, Inc.*,
 616 F.3d 895 (9th Cir. 2010) ................................................................22

*O'Connor v. Davis*,
 126 F.3d 112 (2d Cir. 1997) .................................................................10

*Pastor v. P'ship for Children's Rights*,
 No. 10-cv-5167-CBA-LB, 2012 WL 4503415 (E.D.N.Y. Sept. 28, 2012) .........10

*Reyes v. Remington Hybrid Seed Co.*,
 495 F.3d 403 (7th Cir. 2007) ................................................................22

*Tony and Susan Alamo Found. v. Sec'y of Labor*,
 471 U.S. 290 (1985) ...........................................................................7, 18

*Tyson Foods, Inc. v. Bouaphakeo*,
 136 S. Ct. 1036 (2016) .......................................................................7, 27

*United States v. Rosenwasser*,
 323 U.S. 360 (1945) ...............................................................................9

*Wang v. Hearst Corp.*,
 No. 12-cv-793-JPO, 2016 WL 4468250 (S.D.N.Y. Aug. 24, 2016)............. 16, 23

*WBAI Pacfica Found.*,
 328 NLRB No. 179 (1999) ...................................................................10

**TABLE OF AUTHORITIES**
(continued)

Page

**Statutes**

29 U.S.C. § 151 .................................................................................19

29 U.S.C. § 202(a) ..............................................................................8

**Other Authorities**

*10 Colleges with the Most Interns*,
U.S. News & World Report, June 6, 2015 .........................................14

*2012 National Internship Salary Survey Results to be Released*,
Intern Bridge, Feb. 07, 2013, *available at*
http://www.prweb.com/releases/internbridge/02/prweb10400332.htm ...............21

*Advising FAQs*, Columbia College/Columbia Engineering: Berick Center for
Student Advising, https://www.cc-seas.columbia.edu/csa/faqs ..........................15

Canak, William et al., *Misclassified Construction Employees in Tennessee* (Jan. 5,
2010), *available at*
https://www.carpenters.org/Libraries/AApril_Merlo/TN_payroll_fraud_study_1-
15-10.sflb.ashx .................................................................................25

Carey, Kevin, *Giving Credit, but Is It Due?*,
N.Y. Times, Jan. 30, 2013, *available at*
http://www.nytimes.com/2013/02/03/education/edlife/internships-for-credit-
merited-or-not.html .................................................................... 13, 14

Carré, Francois et al., The Social and Economic Cost of Employee
Misclassification in Construction (Labor and Worklife Program,
Harvard Law School and Harvard School of Public Health, Dec. 2004) ............25

Casey, Laura, *Midcareer Job Seekers Turn to Internships, Volunteer Positions*,
Chi. Trib., Oct. 24, 2011, *available at* http://articles.chicagotribune.com/2011-
10-24/business/ct-biz-1024-midcareer-interns-20111024_1_internships-career-
change-midcareer-professionals ........................................................23

Christian Zhang, *CSA announces changes to course withdrawal, internship
policies*,
Columbia Spectator, Feb. 21, 2014, *available at*
http://columbiaspectator.com/2014/02/21/csa-announces-changes-course-
withdrawal-internship-policies ..........................................................15

**TABLE OF AUTHORITIES**
**(continued)**

Page

Douglas-Gabriel, Douglas, *Should colleges charge for academic credit earned from unpaid internships?*,
Wash. Post, May 16, 2016, *available at* https://www.washingtonpost.com/local/education/should-colleges-charge-for-academic-credit-earned-from-unpaid-internships/2016/05/13/523f9592-12f1-11e6-8967-7ac733c56f12_story.html ..................................................................12

Edwards, Kathryn Ann et al., *Not-So-Equal Protection—Reforming the Regulation of Student Internships*,
The Economic Policy Institute, Apr. 9, 2010, *available at* http://www.epi.org/publication/pm160/ ..............................................................18

Eisenbrey, Ross, *Hillary Clinton Speaks Out for Young Workers*,
The Economic Policy Institute, March 7, 2014, *available at* http://www.epi.org/blog/hillary-clinton-speaks-young-workers/ ......................21

*elaws-OSHA Recordkeeping Advisor*,
U.S. D.O.L., http://webapps.dol.gov/elaws/osha/recordkeeping/05.aspx (some of OSHA's protections exclude unpaid interns) .....................................................10

*Elective Internship*, George Washington Univ. Ctr. for Career Services,
https://careerservices.gwu.edu/internship-credit-recognition .............................14

Fiscal Policy Institute, *New York State Workers Compensation: How Big Is the Shortfall?* (Jan. 2007), *available at* http://www.fiscalpolicy.org/publications2007/FPI_WorkersCompShortfall_With Addendum.pdf ..........................................................................................................25

Fisher, Peter, et al., *Nonstandard Jobs, Substandard Benefits*
Iowa Policy Project (July 2005), *available at* http://www.iowapolicyproject.org/2005docs/051201-nonstdjobs.pdf .................25

Fredericksen, Lauren, *Falling Through the Cracks of Title VII: The Plight of the Unpaid Intern*,
21 Geo. Mason l. Rev. 245 (2013) ....................................................................10

*Frequently Asked Questions*,
Dep't of Labor: Apprenticeship, http://www.dol.gov/apprenticeship/faqs.htm ..15

**TABLE OF AUTHORITIES**
**(continued)**

Page

Gardner, Phil, *Reaction on Campus to the Unpaid Internship Controversy* (2012),
    *available at* http://www.ceri.msu.edu/wp-content/uploads/2009/10/Reaction-on-
    Campus-to-the-Unpaid-Internship-Controversy-Whitepaper.pdf ....................... 13

Gilbertson, Dawn, *Earning It: Glamorous Internships with a Catch: There's No
    Pay*,
    N.Y. Times, Oct. 19, 1997, *available at*
    http://www.nytimes.com/1997/10/19/business/earning-it-glamorous-internships-
    with-a-catch-there-s-no-pay.html ....................................................................... 21

Greenhouse, Steven, *The Unpaid Intern, Legal or Not*,
    N.Y. Times, Apr. 2, 2010, *available at*
    http://www.nytimes.com/2010/04/03/business/03intern.html ............................. 18

Gurchiek, Kathy, *Older, Experienced Workers Applying for Internships*,
    Soc. for Human Resource Mgmt., Aug. 30, 2010, *available at*
    http://www.shrm.org/publications/hrnews/pages/olderinterns.aspx ................... 22

Hickman, Blair, et al., *The Price of an Internship*,
    ProPublica, Dec. 20, 2013, *available at*
    http://projects.propublica.org/internships/ .................................................. 12, 13

*Independent U.S. Summer Internship Credit Option*, UC-Berkeley Career Ctr.,
    https://career.berkeley.edu/Internships/AcadCreditSummer ............................... 14

Intern Bridge, *2010 Internship Salary Report* 12 (2010), *available at*
    http://utsa.edu/careercenter/pdfs/2010%20salary%20report.pdf ....................... 21

Intern Bridge, *The Debate Over Unpaid College Internships* 13 (2010), *available
    at* http://www.ceri.msu.edu/wp-content/uploads/2010/01/Intern-Bridge-Unpaid-
    College-Internship-Report-FINAL.pdf ............................................................... 12

*Internship Co-Curricular Credit*, Barnard College Career Development,
    http://barnard.edu/node/24781 ........................................................................... 15

*Internship Credit*, Columbia Univ. School of General Studies,
    http://bulletin.columbia.edu/general-studies/undergraduates/additional-
    academicopportunities/internship-credit .............................................................. 15

*Internships*, New York Univ. College of Arts & Sciences,
    http://cas.nyu.edu/page/internships .................................................................... 14

**TABLE OF AUTHORITIES**
**(continued)**

Page

Justich, Robert et al., *The Underground Labor Force is Rising to the Surface*,
Bear Stearns Asset Management 3 (Jan. 3, 2005), *available at*
*http://www.steinreport.com/BearStearnsStudy.pdf*.............................................25

Kelsay, Michael P., et al., the Economic Costs of Employee Misclassification in
the State of Indiana (Dept. of Econ., Univ. of Mo.-Kan. City, 2010), *available at*
http://www.isbctc.org/Uploads/UploadedFiles/docs/Misclassification_in_Indiana
_Full_Study__9-10.pdf.........................................................................................25

Kelsay, Michael, et al., the Economic Costs of Employee Misclassification in the
State of Illinois (Dept. of Econ., Univ. of Mo. Kan. City, Dec. 2006), *available
at*
http://www.faircontracting.org/PDFs/prevailing_wages/Illinois_Misclassification
_Study.pdf.............................................................................................................25

Maura Kelly, *The 50-Year-Old Intern: Boomers Go Back to the Bottom*,
Fiscal Times, Mar. 29, 2012, *available at*
http://www.thefiscaltimes.com/Articles/2012/03/29/The-50-Year-Old-Intern-
Boomers-Go-Back-to-the-Bottom......................................................................22

NACE Research, *Unpaid Internships: A Survey of the NACE Membership*,
*available at*
http://liberalarts.utexas.edu/lacs/_files/pdf/Employers/Unpaid%20Internships-
%20A%20Survey%20of%20the%20NACE%20Membership.pdf......................13

National Association of Colleges and Employers,
*Class of 2014 Student Survey*, *available at*
http://career.sa.ucsb.edu/files/docs/handouts/2014-student-survey.pdf...............11

*NBC Universal's New Paid-Intern Policy Yields More Diversity*,
MadameNoire, Aug. 27, 2013, *available at*
http://madamenoire.com/295556/nbcuniversals-new-paid-internpolicy-yields-
diversity/ ...........................................................................................................18

New England Association of Schools and Colleges, *Standards for Accreditation*
(2016), *available at*
https://cihe.neasc.org/downloads/Standards/Standards_for_Accreditation.pdf...13

Perlin, Ross, *Intern Nation: How to Earn Nothing and Learn Little in the Brave
New Economy* (Verso ed., 1st ed. 2011)...................................................... passim

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Questioning the Ethics of Unpaid Internships*,
    National Public Radio (July 13, 2010),
    http://www.npr.org/templates/story/story.php?storyId =128490886 ................. 18

Rich-Kern, Sheryl, *N.H. to the Unemployed: Try an Unpaid Internship*, National
    Public Radio, *available at* http://www.npr.org/2012/05/01/150906124/n-h-to-
    the-unemployed-try-an-unpaid-internship ......................................................... 23

Rubinstein, Mitchell, *Employees, Employers, and Quasi-Employers: An Analysis
    of Employees and Employers Who Operate in the Borderland Between an
    Employer-and-Employee Relationship*,
    14 U. Pa. J. Bus. L. 605 (2012) ......................................................................... 22

Schonfeld, Zach, *In Another Blow to Free Labor, Columbia University Halts
    Academic Credit for Internships*,
    Newsweek, Feb. 28, 2014, *available at* http://www.newsweek.com/another-
    blow-free-labor-columbia-university-halts-academic-credit-internship-230554 15

Shierholz, Heidi, *Six Years from Its Beginning, the Great Recession's Shadow
    Looms over the Labor Market*,
    The Economic Policy Institute, Jan. 9, 2014, *available at*
    http://www.epi.org/publication/years-beginning-great-recessions-shadow/ 17, 18

State of N.J., Comm'n of Investigation, *Contract Labor: The Making of an
    Underground Economy* (Sept. 1997) ................................................................. 25

Sung, Connie, *Are Unpaid Internships Exploitative?*,
    L.A. Times*,* Dec. 30, 2000, *available at*
    http://articles.latimes.com/2000/dec/30/local/me-6350 ....................................... 18

Suzanne Lucas, *A Strong Case for Why You Should Pay Your Interns*,
    Inc., Apr. 22, 2014, *available at* http://www.inc.com/suzanne-lucas/a-strong-
    case-for-why-you-should-pay-your-interns.html ................................................. 18

U.S. Gov't Accountability Office, GAO-09-717,
    *Employee Misclassification: Improved Coordination, Outreach, and Targeting
    Could Better Ensure Detection and Prevention* (2009) ....................................... 24

U.S. Gov't Accountability Office, GAO-15-168R,
    *Contingent Workforce: Size, Characteristics, Earnings, and Benefits* (2015) .... 24

**TABLE OF AUTHORITIES**
(continued)

Page

U.S. Gov't Accountability Office, HEHS-00-76,
*Contingent Workers: Incomes and Benefits Lag Behind Those of Rest of Workforce* (2000), *available at* http://www.gao.gov/assets/240/230443.pdf ......24

Yamada, David C., *"Mass Exploitation Hidden in Plain Sight": Unpaid Internships and the Culture of Uncompensated Work*,
52 Idaho L. Rev. 937 (2016) ...........................................................................22

Yamada, David C., *The Employment Law Rights of Student Interns*,
35 Conn. L. Rev. 215 (2002)...........................................................................10

## INTERESTS OF AMICI CURIAE

Amici curiae[1] are labor unions, non-profit organizations, law professors, and a writer. Amici labor unions are dedicated to ensuring that all people who work receive the rewards they deserve for their work—decent paychecks and benefits, safe jobs, respect and fair treatment. As part of this mission, amici labor unions regularly advocate that the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA" or "the Act"), is interpreted and enforced consistent with its broad remedial nature. The non-profit organization amici are likewise dedicated to education, research, and advocacy issues involving worker rights, working families, and/or economic justice issues. Finally, amici law professors and writer teach and/or research employment law and related issues.

The American Federation of State, County and Municipal Employees ("AFSCME") is a union of 1.6 million members in the United States and Puerto Rico, both in the public and private sectors, who share a commitment to service. AFSCME advocates for prosperity and opportunity for all working families.

The Communications Workers of America, AFL-CIO ("CWA"), is an international labor union representing more than 700,000 workers in the

---

[1] All parties consented to the participation of the amici curiae listed here and to the filing of this brief. *See* Fed. R. App. P. 29(a)(2). No party's counsel authored this brief, in whole or in part, nor did the parties or their counsel contribute money intended to fund the preparation or submission of the brief. No person other than amici curiae, their members, or their counsel contributed money that was intended to fund the preparation or submission of the brief. *See* Fed. R. App. P. 29(a)(4)(E).

telecommunications, media, manufacturing, airlines, and health care industries and in a wide variety of public sector positions in the United States, Canada, and Puerto Rico. CWA is actively involved in representing, organizing, educating, and mobilizing workers throughout the United States and abroad on issues of public concern, including workplace rights and other civil and human rights issues.

The Economic Policy Institute ("EPI") is a non-partisan think tank founded in 1987 to ensure that the interests of working families were considered in economic policy. EPI researches economic conditions and advocates for effective labor standards that provide a solid floor for the labor market. Unpaid labor, especially when it is for the benefit of a for-profit business, undermines the ability of all workers to earn a decent living.

The Intern Worker Alliance ("IWA") is a network challenging unpaid internships through workplace organizing. The network includes current and former interns, labor organizers, cultural producers, and other allies. IWA has won dramatic pay raises for interns at employers including The Nation and Democracy Now. IWA supports broad employment definitions to afford interns rights and protections.

The National Employment Lawyers Association ("NELA") is the largest professional membership organization in the country comprising lawyers who represent workers in labor, employment and civil rights disputes. Founded in

1985, NELA advances employee rights and serves lawyers who advocate for equality and justice in the American workplace. NELA and its 69 circuit, state, and local affiliates have a membership of over 4,000 attorneys who are committed to working on behalf of those who have been illegally treated in the workplace. NELA's members litigate daily in every circuit, affording NELA a unique perspective on how the principles announced by the courts in employment cases actually play out on the ground. NELA strives to protect the rights of its members' clients, and regularly supports precedent-setting litigation affecting the rights of individuals in the workplace.

The National Employment Law Project ("NELP") is a non-profit organization with over 45 years of experience advocating for low-wage and unemployed workers. In NELP's experience studying and applying the Fair Labor Standards Act, any employment arrangement using unpaid labor should be carefully scrutinized under the statute's expansive definition of the term "employee."

The Service Employees International Union ("SEIU") is an international labor union representing more than 2.2 million men and women in healthcare, property services, and public service employment in the United States, Canada and Puerto Rico. SEIU advocates for workers on a diverse range of matters of concern in the workplace.

The United Food and Commercial Workers International Union ("UFCW") is a labor organization of 1.3 million members representing workers across the United States in industries including poultry, meat packing and other food processing, retail food and non-food retail, hospitals, nursing homes, other healthcare, and the chemical industry. UFCW organizes and represents workers and fights to broaden civil, labor, and human rights for all workers in the U.S.

The Writers Guild of America, East, AFL-CIO, ("WGAE") is a labor union founded in 1912 and based in New York City, representing thousands of writers in motion pictures, television, digital media, and broadcast news. The WGAE seeks to promote, protect, and maintain important artistic and professional principles for its members. The WGAE has a long history of confronting unfair practices that occur in the entertainment industry to protect the rights of its members, including unpaid work. A decision against the workers in this case would adversely impact the WGAE's members seeking to make a living in the communications industries.

Scott Moss is a Professor at the University of Colorado Law School and Chair of the Admissions and Career Services Committee. Moss has helped numerous students find work, including with employers offering not only paid internships, but also unpaid internships his school will not sponsor, which has driven some employers to competing schools sponsoring unpaid internships. Moss

also has hired and employed numerous students and graduates, previously as a New York law firm's hiring attorney, and now for his own pro bono litigation.

Ross Perlin is an independent writer and expert on the issue of internships and unpaid labor. Mr. Perlin worked as an unpaid intern and spent three years researching his book *Intern Nation: How To Earn Nothing and Learn Little In the Brave New Economy*, published in 2011. Mr. Perlin speaks and writes regularly on internships for *The New York Times*, *The Washington Post*, *Time*, and others.

David C. Yamada is a Professor of Law and Director of the New Workplace Institute at the Suffolk University School of Law in Boston, Massachusetts. Professor Yamada shares with other parties to this brief a deep concern about the legalities of unpaid internships and the lack of legal protections for those designated as interns by employers. As the author of two law review articles on unpaid internships, Professor Yamada has become closely familiar with the employment law implications of the intern economy. In addition, Professor Yamada has served as a pro bono subject matter expert for reporters writing news articles and investigative studies on unpaid internships.

## SUMMARY OF ARGUMENT

In the decision now on appeal, the district court granted summary judgment to the defendant employer, the Hearst Corporation ("Hearst"), by concluding that no reasonable jury could find that the plaintiffs are employees doing work meriting

5

payment of minimum wages under the Fair Labor Standards Act  and as interpreted by this Court in *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528 (2d Cir. 2015).

This case presents the second time within the last few years that this Court has occasion to consider the specific and important issues of unpaid labor presented by internships, and to expand on the meaning and proper application of *Glatt*.  Amici respectfully submit that, if anything, the concerns of the dangers of alternative working arrangements (including rampant use of unpaid interns) have further crystallized even in the short period since *Glatt* was decided.  Against that backdrop, this case presents the opportunity to clarify to district courts that *Glatt* did not upset the well-settled law that the FLSA must be interpreted liberally and that its exceptions and exemptions should be applied narrowly, *see* Part I *infra*.  To the contrary, given how fact-intensive the inquiry into economic realities necessarily is, and especially due to the governing "totality of the circumstances" test that rests on a factual comparison of differential benefits (benefits to the intern/employee, benefits to the employer), it is especially important to send disputed issues of fact to the jury, which the District Court did not do here.  *See* Parts II and III *infra*.

## ARGUMENT

**I.**    **The Remedial Nature of the FLSA Warrants an Expansive**
**Interpretation of Its Worker-Protective Provisions.**

As this Court has "repeatedly affirmed" in various contexts for the better
part of a century, "'the remedial nature of the FLSA warrants an expansive
interpretation of its provisions so that they will have the widest possible impact in
the national economy.'"  *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 113-14 (2d
Cir. 2015).

The Supreme Court has likewise long emphasized that courts must give the
worker-protective provisions of the FLSA "broad" readings rather than "'narrow,
grudging'" ones.  *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1,
11-13 (2011); *see also Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1047
(2016) (noting the "'remedial nature of [the FLSA] and the great public policy
which it embodies,'" and the consequent imperative to reduce burdens on
employees seeking to vindicate their rights (quoting *Anderson v. Mt. Clemens
Pottery Co.*, 328 U.S. 680, 687 (1946))); *Tony and Susan Alamo Found. v. Sec'y of
Labor*, 471 U.S. 290, 296 (1985) (Courts have "consistently construed the [FLSA]
'liberally to apply to the furthest reaches consistent with congressional direction.'"
(quoting *Mitchell v. Lublin, McGaughy & Assocs.*, 358 U.S. 207, 211 (1959)));
*Barrentine v. Ark. Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) (FLSA meant
to protect workers "from the *evil* of overwork as well as underpay" (emphasis

added; internal quotation marks omitted)); *Falk v. Brennan*, 414 U.S. 190, 206 n.3 (1973) (in amending the FLSA, Congress endorsed a "'liberal interpretation'" of this "'remedial and humanitarian legislation'").

The FLSA's purposes boil down to the goal of eliminating "labor conditions detrimental to the maintenance of [a] minimum standard of living" for workers. 29 U.S.C. § 202(a). To achieve this purpose, the FLSA's measures include minimum wages, maximum hours, prohibitions on retaliation for enforcing FLSA rights, and mechanisms for both public and private enforcement of the statute's commands. These provisions improve workers' "bargaining strength vis-à-vis employers" and eliminate "unfair competition, not only among employers, but also among workers looking for jobs." *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12-13 (2d Cir. 1984); *see also Kasten*, 563 U.S. at 11-12.

Underpinning these measures is a definition of "employee" that likewise demands the most liberal interpretation:

> The Supreme Court has observed . . . that the "striking breadth" of the FLSA's definition of "employ" "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles," in order to effectuate the remedial purposes of the act.

*Barfield v. N.Y.C. Health and Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (citations omitted); *see also Irizarry v. Catsimatidis*, 722 F.3d 99, 103 (2d Cir.

8

2013); *United States v. Rosenwasser*, 323 U.S. 360, 362 (1945) ("A broader or more comprehensive coverage of employees . . . would be difficult to frame.").

By the same token, any exceptions that undercut the worker-protective purposes of the FLSA, including to the definition of "employee," are construed narrowly. *See, e.g.*, *Bachayeva v. Americare Certified Special Servs., Inc.*, No. 12-CV-1466 RRM, 2013 WL 1171741, at *4 (E.D.N.Y. Mar. 20, 2013) ("Since the FLSA is a remedial statute, the exemptions are to be narrowly construed and the employer must show that the employee fits 'plainly and unmistakably within [the exception's] terms.'" (citing *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)).

## II. An Overbroad Definition of "Internships" Has Grave, Wide-Ranging Financial and Personal Impact on Vulnerable Workers.

This Court has held (and it is not here suggested otherwise) that unpaid internships can be and sometimes are legal. However, it is important to underscore the economic context in which unpaid internships exist and have proliferated. This context highlights certain flaws with the district court's application of this Court's test in *Glatt*, as discussed more below.

### A. Workers who are denied "employee" status often suffer immediate and ongoing economic struggles.

When workers are classified as "unpaid interns," they lose out on the primary benefit of labor: pay (to say nothing of being unprotected under other

9

employment laws, such as laws preventing discrimination and sexual harassment).[2]

But the protections of the FLSA are intended to set a baseline for the least

powerful workers, forcing any employer who wishes to benefit from their labor to

compensate them properly and treat them with certain human dignities. *See*

*Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 707 n.18 (1945) (The "prime purpose

of the [FLSA] was to aid the unprotected, unorganized and lowest paid of the

nation's working population; that is, those employees who lacked sufficient

bargaining power to secure for themselves a minimum subsistence wage."

(summarizing legislative history)).

Moreover, unpaid interns have worse employment prospects than their paid

counterparts. Whereas having a paid internship is highly correlated with receiving

---

[2] *See generally* David C. Yamada, *The Employment Law Rights of Student Interns*, 35 Conn. L. Rev. 215, 238-48 (discrimination law generally), 251-53 (workers' compensation), and 255-56 (National Labor Relations Act) (2002). Some courts have denied unpaid interns these rights, thereby insulating employers from these obligations. *See* Lauren Fredericksen, *Falling Through the Cracks of Title VII: The Plight of the Unpaid Intern*, 21 Geo. Mason L. Rev. 245, 248 (2013); *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 372 (2d Cir. 2006) ("'Where no *financial benefit* is obtained by the purported employee from the employer, no plausible employment relationship of any sort can be said to exist'" for the purposes of Title VII (emphasis added; quoting *O'Connor v. Davis*, 126 F.3d 112, 115-16 (2d Cir. 1997))); *Pastor v. P'ship for Children's Rights*, No. 10-cv-5167-CBA-LB, 2012 WL 4503415, at *3 (E.D.N.Y. Sept. 28, 2012) (applying *O'Connor*'s reasoning to ADA); *Brown v. Nationscredit Commercial Corp.*, No. 3:99-CV-592-EBB, 2000 WL 887593, at *3-4 (D. Conn. June 26, 2000) (applying *O'Connor*'s reasoning to ADEA); *WBAI Pacfica Found.*, 328 NLRB No. 179 (1999) (NLRA provides no collective-bargaining rights to "unpaid staff"); *elaws-OSHA Recordkeeping Advisor*, U.S. D.O.L., http://webapps.dol.gov/elaws/osha/recordkeeping/05.aspx (some of OSHA's protections exclude unpaid interns).

job offers upon graduation from college, unpaid internships are as likely to lead to job offers as no internship at all.[3] The difference is even more stark when comparing whether for-profit providers of internships make job offers to interns. Whereas 42% of paid interns receive subsequent job offers, only 15.4% of unpaid interns do.[4] Likewise, among those who do receive job offers, paid internships are correlated with higher salaries ($54,304); unpaid internships are correlated with essentially the same pay as doing no internship at all ($37,612 and $37,277, respectively).[5]

That unpaid internships provide no wages multiplies the financial hardship that student-interns already suffer. Academic institutions tend to require that their students directly pay the school substantial sums (over and above rent and other costs of living) to bless their unpaid internships with academic credits. Up until spring 2015, George Washington University—named by The Princeton Review as the #1 College for Internships in 2015—charged students $1,300 for "elective credits" for internships.[6] At Bellarmine University and the University of

---

[3] *See* National Association of Colleges and Employers, *Class of 2014 Student Survey* at 40, *available at* http://career.sa.ucsb.edu/files/docs/handouts/2014-student-survey.pdf (65.4% of students who were paid interns at for-profit companies received job offers, compared with 38.5% of those who were unpaid interns and 38.6% of those who did no internship).

[4] *Id*. at 43.

[5] *Id*. at 41.

[6] George Washington University recently changed its policy in response to a student-led campaign. The price has now dropped to $50. *See* Jacqueline

Pittsburgh, students were required to pay as much as $8,724 and $6,558, respectively, for internship credits.[7] Three-fourths of unpaid interns in college report that they needed a second paying job in order to cover living expenses and the payments for the required academic credits for their unpaid internship.[8] These students' financial struggles should not be surprising, since these students are, in essence, paying tuition to work for free. This contributes to the burgeoning student debt crisis, and compounds pre-existing inequalities, as discussed below.[9]

### B. Educational institutions have not imposed the kinds of oversight that might mitigate inequities inherent in unpaid internships.

Unpaid internships receive little oversight and generally provide minimal educational benefits. One higher-education accreditation agency requires universities to ensure that internships have "demonstrable academic content" that

---

Thomsen, *After student-led push, GW slashes costs for internship credit*, GW Hatchet, Feb. 9, 2015, *available at* http://www.gwhatchet.com/2015/02/09/after-student-led-push-gw-slashes-costs-for-internship-credit/.

[7] *See* Blair Hickman et al., *The Price of an Internship*, ProPublica, Dec. 20, 2013, *available at* http://projects.propublica.org/internships/.

[8] Intern Bridge, *The Debate Over Unpaid College Internships* 13 (2010), *available at* http://www.ceri.msu.edu/wp-content/uploads/2010/01/Intern-Bridge-Unpaid-College-Internship-Report-FINAL.pdf.

[9] *See* Danielle Douglas-Gabriel, *Should colleges charge for academic credit earned from unpaid internships?*, Wash. Post, May 16, 2016, *available at* https://www.washingtonpost.com/local/education/should-colleges-charge-for-academic-credit-earned-from-unpaid-internships/2016/05/13/523f9592-12f1-11e6-8967-7ac733c56f12_story.html.

is comparable to institutional learning experiences when awarding credit for internships.[10]

Unfortunately, checks on interns' learning are scant in practice.[11] As one survey of larger schools found, only 27.6% of school-supported internships were associated with classroom experience.[12] Moreover, faculty members generally do not or cannot provide separate oversight of internships.[13] Instead, internships are usually managed, if at all, by campus career centers, which typically have only a small staff and focus on students' labor market readiness.[14] For example, UC Berkeley allows students to receive academic credit for their internships through an

---

[10] New England Association of Schools and Colleges, *Standards for Accreditation* 11 (2016), *available at* https://cihe.neasc.org/downloads/Standards/Standards_for_Accreditation.pdf.

[11] *See generally* Kevin Carey, *Giving Credit, but Is It Due?*, N.Y. Times, Jan. 30, 2013, *available at* http://www.nytimes.com/2013/02/03/education/edlife/internships-for-credit-merited-or-not.html; Hickman, *supra* note 7; Phil Gardner, *Reaction on Campus to the Unpaid Internship Controversy* 7 (2012), *available at* http://www.ceri.msu.edu/wp-content/uploads/2009/10/Reaction-on-Campus-to-the-Unpaid-Internship-Controversy-Whitepaper.pdf (noting that only half of all educational institutions had oversight over internship positions).

[12] NACE Research, *Unpaid Internships: A Survey of the NACE Membership*, at http://liberalarts.utexas.edu/lacs/_files/pdf/Employers/Unpaid%20Internships-%20A%20Survey%20of%20the%20NACE%20Membership.pdf.

[13] Among 8,939 respondents at 234 colleges, only 15 percent of those getting credit reported that an adviser or faculty member visited their work site. *Id.*

[14] Ross Perlin, *Intern Nation: How to Earn Nothing and Learn Little in the Brave New Economy* 87 (Verso ed., 1st ed. 2011).

online course managed and run by the career center.[15]  Any evaluations of the

educational content of an internship tends to be based on a short form filled out by

a supervisor.[16]

Many schools award credit for internships in name only, refusing to count

these credits towards graduation or degree requirements.[17]  George Washington

University's elective credits, for example, do not count toward graduation.[18]

Certain programs at New York University provide credit if the internship is related

to the major, but they do not count toward degree requirements.[19]  Until recently,

Columbia University allowed most undergraduates to receive "registration credits"

which did not count toward graduation.[20]  Barnard College still awards such

credits, though they call them "co-curricular credits."[21]

---

[15] *See Independent U.S. Summer Internship Credit Option*, UC-Berkeley Career Ctr., https://career.berkeley.edu/Internships/AcadCreditSummer.

[16] Carey, *supra* n. 11.

[17] Other schools require unpaid internships for graduation or certain majors, compelling students to intern, off-campus, without pay.  For example, SUNY–New Paltz requires that journalism majors complete an internship.  *See Internships/Careers*, New Paltz – Digital Media and Journalism, https://www.newpaltz.edu/digitalmediajournalism/internshipscareers/.  *See also, e.g.*, *10 Colleges with the Most Interns*, U.S. News & World Report, June 6, 2015 ("At Elmira College in New York, students are expected to complete at least 240 hours of career experience" to graduate.)

[18] *Elective Internship*, George Washington Univ. Ctr. for Career Services, https://careerservices.gwu.edu/internship-credit-recognition.

[19] *See Internships*, New York Univ. College of Arts & Sciences, http://cas.nyu.edu/page/internships.

[20] *See Advising FAQs* (under "Does Columbia offer credit for internships?" and "How do I audit a class? (For CC Seniors only)"), Columbia College/Columbia

Recently, certain institutions have stopped offering credit for internships altogether, stating that they "expect companies to appropriately compensate students for work performed during internships."[22]

In contrast to unpaid internships, apprenticeships registered with the U.S. Department of Labor's Office of Apprenticeship are required to provide a minimum of 144 classroom hours of approved institutional training, and at least 2,000 hours of on-the-job training, all while paying an average of "approximately $15.00 per hour" and leading to average starting wages of "approximately $50,000 annually."[23]

The foregoing reflects that educational institutions often do not (or perhaps realistically cannot) impose serious educational demands on internships. This should be kept in mind in evaluating the second factor (educational content, *see*

---

Engineering: Berick Center for Student Advising, https://www.cc-seas.columbia.edu/csa/faqs; Christian Zhang, *CSA announces changes to course withdrawal, internship policies*, Columbia Spectator, Feb. 21, 2014, *available at* http://columbiaspectator.com/2014/02/21/csa-announces-changes-course-withdrawal-internship-policies; *Internship Credit*, Columbia Univ. School of General Studies, http://bulletin.columbia.edu/general-studies/undergraduates/additional-academicopportunities/internship-credit.

[21] *See Internship Co-Curricular Credit*, Barnard College Career Development, http://barnard.edu/node/24781.

[22] *See, e.g.*, Zach Schonfeld, *In Another Blow to Free Labor, Columbia University Halts Academic Credit for Internships*, Newsweek, Feb. 28, 2014 (quoting Dean of Academics Kathryn Yatrakis), *available at* http://www.newsweek.com/another-blow-free-labor-columbia-university-halts-academic-credit-internship-230554.

[23] *Frequently Asked Questions*, Dep't of Labor: Apprenticeship, http://www.dol.gov/apprenticeship/faqs.htm; Perlin, *supra* note 14, at 44.

811 F.3d at 537) and third factor (ties to formal education, *see id.*) of the *Glatt* test. Furthermore, both of these factors ask questions of "extent," *Glatt*, 811 F.3d at 537, and are factual issues.

Notwithstanding this context, the district court appears to have given full credence to Hearst's facts and none to the plaintiffs', limiting the question of the quality of purported "educational" benefits *solely* to the "practical skills" the plaintiffs received, which appear to be meager, *see Wang v. Hearst Corp.*, No. 12-cv-793-JPO, 2016 WL 4468250, at *5 (S.D.N.Y. Aug. 24, 2016), instead of "including" those purported skills among other kinds of education, including any training Hearst provided that was similar to that which the plaintiffs received in their clinical and hands-on courses in school, *see Glatt*, 811 F.3d at 537.

On the third factor, the district court gave disproportionate weight to Hearst's facts, disregarding the plaintiffs' evidence that two of them did not receive credit at all, that another was required to purchase a credit that her own school did not honor, and that there was little or no further involvement by an academic institution. *See Wang*, 2016 WL 4468250, at *6.

### C. The proliferation of unpaid work tends to burden poorer families and ultimately also federal, state, and local governments.

The same biases that make antidiscrimination statutes necessary for ensuring equal employment rights also make the poorest members of protected classes those most likely to be forced to consider unpaid work. For instance, racial and ethnic

minorities have suffered significantly more joblessness since the Great Recession; it is particularly unjust for them (and others disadvantaged in the labor market) to face the Hobson's choice of an unpaid internship or no experience at all.[24]

The impact extends to workers' families and the community itself: employers that bring on unpaid interns shift the costs of labor onto workers, their families, and state and federal governments. Unpaid interns and their families take the immediate burden, at times needing to take out additional loans, burning through savings, and seeking family or government support.[25] Federal, state, and local governments collect no taxes on uncompensated labor, losing many millions of dollars in potential revenue.[26]

As an indicator of what is possible under a different regime, NBC Universal began paying interns in 2013 and reported a big increase in applicant diversity; it

---

[24] *See* Heidi Shierholz, *Six Years from Its Beginning, the Great Recession's Shadow Looms over the Labor Market*, The Economic Policy Institute, Jan. 9, 2014, *available at* http://www.epi.org/publication/years-beginning-great-recessions-shadow/.

[25] Perlin, *supra* note 14, at 127.

[26] Perlin, *supra* note 14, at 27 (Conservative estimates show that 1 to 2 million individuals engage in unpaid internships each year, which depending on the amount of hours worked, may account for tens of millions dollars of lost payroll taxes, workers' compensation premiums, and unemployment insurance taxes to states and the federal government).

now attracts (and ultimately assists in advancing) many who could not otherwise

afford to relocate to New York.[27]

### D. The proliferation of unpaid work undermines all workers' ability to seek wages commensurate with the value of their work.

Removing protections for some workers harms not just those workers

seeking unpaid internships, but *all* workers. Because they do much of the same

work as paid staff, unpaid interns' labor competes with the labor provided by paid

employees.[28] Giving employers a free substitute for paid labor devalues the labor

of even of those workers who remain protected by the FLSA. *See Tony and Susan*

*Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 302 (1985) ("the purposes of the

Act require that it be applied even to those who would decline its protections"

---

[27] *See NBC Universal's New Paid-Intern Policy Yields More Diversity*, MadameNoire, Aug. 27, 2013, *available at* http://madamenoire.com/295556/nbcuniversals-new-paid-internpolicy-yields-diversity/; *see also* Suzanne Lucas, *A Strong Case for Why You Should Pay Your Interns*, Inc., Apr. 22, 2014, *available at* http://www.inc.com/suzanne-lucas/a-strong-case-for-why-you-should-pay-your-interns.html (arguing that, by paying interns, companies can generate three times as many applicants).

[28] At present, employers regularly eliminate staff and replace them with unpaid interns. Shierholz, *supra* note 24; Kathryn Ann Edwards et al., *Not-So-Equal Protection—Reforming the Regulation of Student Internships*, The Economic Policy Institute, Apr. 9, 2010, *available at* http://www.epi.org/publication/pm160/; Perlin, *supra* note 14, at 62, 140; Connie Sung, *Are Unpaid Internships Exploitative?*, L.A. Times, Dec. 30, 2000 (reporting the story of a journalism student that worked without pay 25 hours a week as a fact checker at a local magazine), *available at* http://articles.latimes.com/2000/dec/30/local/me-6350; Steven Greenhouse, *The Unpaid Intern, Legal or Not*, N.Y. Times, Apr. 2, 2010, *available at* http://www.nytimes.com/2010/04/03/business/03intern.html; *Questioning the Ethics of Unpaid Internships*, National Public Radio (July 13, 2010), http://www.npr.org/templates/story/story.php?storyId =128490886.

because making "exceptions to coverage" for them permits employers to use their "superior bargaining power to coerce employees" to volunteer their labor for free and thereby "exert[s] a general downward pressure on wages"). When they are able to obtain labor from some individuals without paying them wages, employers force paid staff to compete with unpaid staff and thus to cede ground in order to stave off the threat of replacement. This reduction in the value of labor will be especially harsh during the "recurrent business depressions" whose effects on wages Congress designed the NLRA to mitigate. *See* 29 U.S.C. § 151. While many issues factor into compensation, this loss of bargaining power for workers creates the risk of wage stagnation or diminution.

## III.   An Overbroad Reading of This Court's Prior Rulings Could Improperly Expand the Use of Unpaid Labor.

### A.   Employers are incentivized to cut labor costs by wrongly classifying employees as interns.

Employers have multiple incentives to replace certain paid staff with unpaid interns and to classify workers in a manner that drives down workers' bargaining power; correspondingly, employers operate in a legal climate that requires minimal pay.

The replacement of paid staff with unpaid interns has long been on the rise. At present, companies save some $2 billion annually by not paying interns the

19

minimum wage.[29]  But at least since the 1970s, scholars have noticed that

"[u]npaid internships . . . tended to crowd the paid ones off the road."[30]

A study conducted by a University of Missouri professor found that in 1976,

57% of television and 81% of radio interns received some pay.[31]  Almost two

decades later, in 1991, there were three to five times as many interns but only 21%

and 32%, respectively, received pay.[32]  Today, only 19% of interns in television

and radio broadcasting are paid, only 40% of interns in arts and entertainment are

paid, and only 41% of journalism interns are paid.[33]

This upsurge in unpaid internships in for-profit firms—and thus the import

of this Court's decision of this appeal, insofar as it involves a for-profit (and

successful) company—is not limited to the entertainment and communications

industry.  Similar patterns exist in a variety of sectors.  According to a 2010 report

by Intern Bridge, a national college recruiting research firm, compensated

internships in some industries were in danger of disappearing altogether: only 11

percent of game-design interns were paid; less than 16 percent of interns in law

---

[29] Perlin, *supra* note 14, at 124.
[30] Perlin, *supra* note 14, at 28.
[31] *Id.*
[32] *Id.*
[33] *Id.*

enforcement and security were paid, and only 28 percent of interns in healthcare consulting were paid.[34]

Though precise figures as to the present numbers of unpaid interns are unavailable, conservative estimates reflect that between 1 and 2 million workers participate in internships each year in the U.S.[35]  Between 1981 and 1991, the proportion of college graduates who engaged in paid and unpaid internships increased from one in thirty-six (under 3%) to one in three (circa 33%).[36]  Today, there are estimates that half (50%) of graduating college students have interned, and more than half of that internship work was unpaid.[37]  Other sources estimate that upwards of 500,000 college students are working without pay at any given time.[38]

---

[34] *See* Intern Bridge, *2010 Internship Salary Report* 12-13 (2010), *available at* http://utsa.edu/careercenter/pdfs/2010%20salary%20report.pdf.

[35] *See* Perlin, *supra* note 14, at 27.

[36] *See* Dawn Gilbertson, *Earning It: Glamorous Internships with a Catch: There's No Pay*, N.Y. Times, Oct. 19, 1997, *available at* http://www.nytimes.com/1997/10/19/business/earning-it-glamorous-internships-with-a-catch-there-s-no-pay.html.

[37] *See* Greenhouse, *supra* note 28; *2012 National Internship Salary Survey Results to be Released*, Intern Bridge, Feb. 07, 2013, *available at* http://www.prweb.com/releases/internbridge/02/prweb10400332.htm (finding that 51.3 % of students are not paid for their internship); *see* Gilbertson, *supra* note 36 ("Internship experts estimate that 50 to 60 percent of all student internships are unpaid.").

[38] *See* Ross Eisenbrey, *Hillary Clinton Speaks Out for Young Workers*, The Economic Policy Institute, March 7, 2014, *available at* http://www.epi.org/blog/hillary-clinton-speaks-young-workers/.

Internships are increasingly a part of year-round business operations among for-profit companies.[39]  Notably, unpaid work dressed up as internships and fellowships has expanded far beyond the end of schooling.[40]  Such internships are often held by recent graduates and by older workers transitioning into new careers; these populations are, in fact, the fastest-growing segment of interns.[41]  A 2010 survey found 23% of hiring managers received intern applications from experienced workers.[42]

Mark Cuban, the billionaire investor, thanked the weak job market for driving labor prices down: "[o]ne silver lining of a 'great recession' that we are now in is that there are a lot of incredibly talented people without jobs, or who

---

[39] For example, a search on August 11, 2015 of leading internship-search website Internships.com showed 834 opportunities within a 20 mile radius of New York City were available for the fall of 2015.  Of these, 683 (81.8%) were unpaid.

[40] *See e.g.*, David C. Yamada, *"Mass Exploitation Hidden in Plain Sight": Unpaid Internships and the Culture of Uncompensated Work*, 52 Idaho L. Rev. 937 (2016); Mitchell Rubinstein, *Employees, Employers, and Quasi-Employers: An Analysis of Employees and Employers Who Operate in the Borderland Between an Employer-and-Employee Relationship*, 14 U. Pa. J. Bus. L. 605 (2012); *Narayan v. EGL, Inc.*, 616 F.3d 895 (9th Cir. 2010); *Carrillo v. Schneider Logistics, Inc.*, 823 F. Supp. 2d 1040 (C.D. Cal. 2011), *aff'd*, 501 F. App'x 713 (9th Cir. 2012 Mem. Disp.); *Reyes v. Remington Hybrid Seed Co.*, 495 F.3d 403, 407 (7th Cir. 2007).

[41] Kathy Gurchiek, *Older, Experienced Workers Applying for Internships*, Soc. for Human Resource Mgmt., Aug. 30, 2010, *available at* http://www.shrm.org/publications/hrnews/pages/olderinterns.aspx; Perlin, *supra* note 14, at 177-78.

[42] Gurchiek, *supra* note 41; *see also* Maura Kelly, *The 50-Year-Old Intern: Boomers Go Back to the Bottom*, Fiscal Times, Mar. 29, 2012, *available at* http://www.thefiscaltimes.com/Articles/2012/03/29/The-50-Year-Old-Intern-Boomers-Go-Back-to-the-Bottom.

have lost their jobs," whom he could then hire as unpaid interns.[43]  Employers also turn to unemployed adult professionals for free work, taking advantage of mid-career professionals who have lost their jobs by hiring them as unpaid interns, luring them with a promise of a job even while they continue to receive unemployment benefits.[44]

The foregoing facts about displacement of workers by interns highlight the grave consequences of interpreting the *Glatt* opinion in an overbroad fashion. Unfortunately, the district court misapplied the sixth *Glatt* factor (work that complements, not displaces, *see* 811 F.3d at 537) in its summary judgment ruling. Specifically, it turned *Glatt*'s requirement that would-be interns do *additional*, helpful work into a requirement that would-be interns do *anything but* the most menial work.  *See Wang*, 2016 WL 4468250, at *8.  Such an interpretation enables companies to displace paid workers with unpaid ones, with little fear of the consequences.

---

[43] Perlin, *supra* note 14, at 123.

[44] Laura Casey, *Midcareer Job Seekers Turn to Internships, Volunteer Positions*, Chi. Trib., Oct. 24, 2011, *available at* http://articles.chicagotribune.com/2011-10-24/business/ct-biz-1024-midcareer-interns-20111024_1_internships-career-change-midcareer-professionals; Sheryl Rich-Kern, *N.H. to the Unemployed: Try an Unpaid Internship*, National Public Radio, *available at* http://www.npr.org/2012/05/01/150906124/n-h-to-the-unemployed-try-an-unpaid-internship.

**B.     Employers are also incentivized to misclassify employees as, for example, overtime-exempt or independent contractors.**

It is important to understand that, in the view of amici, the growing use of year-round unpaid internships is one of many types of unconventional and alternative work arrangements that require great scrutiny.[45] These include the classification (often misclassification) of employees as independent contractors, franchisees, and trainees to place them outside of the protections of labor and employment laws, and the growing use of contingent workers (creating diluted, and often flouted, obligations).

Many states have studied the problem and find high rates of misclassification, especially in construction, where as many as 47% of employers

---

[45] A Government Accountability Office ("GAO") analysis from 2015 concluded that "contingent workers comprised 35.3 percent of employed workers in 2006 and 40.4 percent in 2010." *See* U.S. Gov't Accountability Office, GAO-15-168R, *Contingent Workforce: Size, Characteristics, Earnings, and Benefits* 4 (2015). An earlier report had pegged the contingent workforce percentage at just under 30 percent. *See* U.S. Gov't Accountability Office, HEHS-00-76, *Contingent Workers: Incomes and Benefits Lag Behind Those of Rest of Workforce* 4 (2000), *available at* http://www.gao.gov/assets/240/230443.pdf. The report noted that most of these workers were more likely than traditional full-time employees to have low family incomes and many had incomes below the federal poverty threshold. *See id.* The GAO also reported in 2009 that "[t]he national extent of employee misclassification is unknown; however, earlier and more recent, though not as comprehensive studies suggest that it could be a significant problem with adverse consequences." *See* U.S. Gov't Accountability Office, GAO-09-717, *Employee Misclassification: Improved Coordination, Outreach, and Targeting Could Better Ensure Detection and Prevention* (Preface) (2009).

were found to have misclassified their employees.[46]  Most of these studies do not

capture the so-called "underground economy," where workers are paid off-the-

books, sometimes in cash.[47]  These workers are *de facto* misclassified independent

contractors, because the employers do not withhold and report taxes or comply

with other basic workplace rules.  Many of these jobs are filled by immigrant and

lower-wage workers.[48]

---

[46] *See* Fiscal Policy Institute, *New York State Workers' Compensation: How Big Is the Shortfall?* (Jan. 2007), *available at* http://www.fiscalpolicy.org/publications2007/FPI_WorkersCompShortfall_WithAddendum.pdf; Michael Kelsay, James Sturgeon et al., the Economic Costs of Employee Misclassification in the State of Illinois (Dept. of Econ., Univ. of Mo. Kan. City, Dec. 2006), *available at* http://www.faircontracting.org/PDFs/prevailing_wages/Illinois_Misclassification_Study.pdf; Michael P. Kelsay et al., the Economic Costs OF Employee Misclassification in the State of Indiana (Dept. of Econ., Univ. of Mo.-Kan. City, 2010), *available at* http://www.isbctc.org/Uploads/UploadedFiles/docs/Misclassification_in_Indiana_Full_Study__9-10.pdf; Peter Fisher et al., *Nonstandard Jobs, Substandard Benefits*, Iowa Policy Project (July 2005), *available at* http://www.iowapolicyproject.org/2005docs/051201-nonstdjobs.pdf; Francois Carré et al., *The Social and Economic Cost of Employee Misclassification in Construction* (Labor and Worklife Program, Harvard Law School and Harvard School of Public Health, Dec. 2004); State of N.J., Comm'n of Investigation, *Contract Labor: The Making of an Underground Economy* (Sept. 1997); William Canak et al., *Misclassified Construction Employees in Tennessee* (Jan. 5, 2010), *available at* https://www.carpenters.org/Libraries/AApril_Merlo/TN_payroll_fraud_study_1-15-10.sflb.ashx.

[47] Bear Stearns in 2005 estimated that the U.S. is losing $35 billion annually due to off-the-books employment.  Robert Justich et al., *The Underground Labor Force is Rising to the Surface*, Bear Stearns Asset Management 3 (Jan. 3, 2005), *available at http://www.steinreport.com/BearStearnsStudy.pdf*.

[48] Carré, *supra* note 46.

Employers, particularly in highly competitive, labor-intensive sectors, may conclude that it pays to stretch and even overtly violate the FLSA (by classifying individuals as interns or overtime-exempt, or by other means) because they gain a competitive advantage over law-abiding employers that pay minimum wage, overtime, unemployment insurance, workers' compensation, and payroll taxes.

### C. A decision from this Court that accounts for the economic realities of workers can demonstrate the proper scope of *Glatt*.

In *Glatt*, this Court established a "totality of the circumstances" test for "whether the intern or the employer is the primary beneficiary of the relationship" and "articulated a set of non-exhaustive factors to aid" in answering this question. 811 F.3d 536-37 (2d Cir. 2015). In so doing, the Court noted the importance of the "economic realities" facing workers. *Id*. at 535.

Amici urge that the Court continue to keep in view those economic realities described in the foregoing sections of this brief as it provides any further elaboration or discussion of the questions at issue. Maintaining a complete view of the facts is especially important where, as here, the central question turns on a "'case-by-case,'" "nuanced," "flexib[le]" comparison of the "diverse" array of "tangible and intangible" benefits that a worker receives against the worker's "equally diverse" array of "contribution[s] to the employer's operation," based on all kinds of "particular facts." *Glatt*, 811 F.3d at 535, 536 (quoting *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141-42 (2d Cir. 2008)). Because this

26

comparison is virtually impossible to measure objectively, when an intern conveys *any* meaningful value to the employer, a proper reading of the law is that they have produced sufficient "evidence on which the jury could reasonably find for the plaintiff," and that the court must deny summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also, e.g.*, *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016) (vacating district court's grant of summary judgment for defendant on FMLA claim because jury could differ in its view of totality of circumstances from judge's conclusion); *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 114-15 (2d Cir. 2013) (same, with respect to NYCHRL claim); *see generally Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1049 (2016) (emphasizing that determining factual matters in FLSA context is "near-exclusive province of the jury").

Amici are concerned that the district court applied the *Glatt* test in a fashion that tends to expand the scope of who is an "intern" and, in so doing, resolved underlying factual questions against the non-moving party rather than reserving such fact-intensive questions to the factfinder at trial.

## CONCLUSION

Amici respectfully submit that, especially given the economic backdrop of internships, the *Hearst* case should go to a jury.

27

Dated:  January 13, 2017         Respectfully submitted,

By:  /s/ Rachel J. Geman

Rachel Geman
**LIEFF CABRASER
HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:   (212) 355-9500
Facsimile:   (212) 355-9592

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because this brief contains 6,359 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), according to the word count of the Microsoft Word processing system used to prepare the brief.

I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced, serifed, size 14 typeface using Microsoft Word.


Dated: January 13, 2017            By: /s/ Rachel J. Geman

Rachel Geman
**LIEFF CABRASER**
**HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile:   (212) 355-9592

*Counsel for Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 13, 2017, I electronically filed the foregoing

Amicus Brief with the Clerk of the Court of the U.S. Court of Appeals for the

Second Circuit by using the Appellate CM/ECF system.  All participants are

registered CM/ECF users and will be served by the Appellate CM/ECF system.


Dated:  January 13, 2017                   By:  /s/ Rachel J. Geman

                                           Rachel Geman
                                           **LIEFF CABRASER HEIMANN &**
                                           **BERNSTEIN, LLP**
                                           250 Hudson Street, 8th Floor
                                           New York, NY 10013-1413
                                           Telephone:  (212) 355-9500
                                           Facsimile:   (212) 355-9592

                                           *Counsel for Amici Curiae*


1333995.13