# 16-3302-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

XUEDAN WANG, on behalf of herself and all others similarly situated, MATTHEW JORDAN WAGSTER, ERIN E. SPENCER, on behalf of herself and all others similarly situated, ALEXANDRA RAPPAPORT, SARAH WHEELS,

*Plaintiffs – Appellants,*

JESSICA ANN BEST, PAUL VANCE, COURTNEY HOLT, JANET E. GLAZIER, REBECCA E. DIXON, ERIN D. SULLIVAN, CARLY ROCKWELL, DANA LYNN VOGEL, ELIZABETH MANCINI, STEPHANIE LAUREN SKORKA, CAITLIN LESZUK,

*Plaintiffs,*

v.

THE HEARST CORPORATION,

*Defendant – Appellee*

On Appeal from the United States District Court for
the Southern District of New York, Civil Action No. 12-cv-793

## BRIEF FOR DEFENDANT-APPELLEE

Eve Burton
Jonathan R. Donnellan
Kristina E. Findikyan
Jennifer D. Bishop
Hearst Corporation
300 West 57th Street
New York, New York 10019
(212) 841-7000
*Counsel for Defendant-Appellee*
*The Hearst Corporation*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1, Appellee states the following:

Hearst Corporation is a privately-held company with no parent corporation.

No publicly held corporation owns 10% or more of Hearst Corporation stock.

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ........................................................................v

INTRODUCTION ......................................................................................1

COUNTERSTATEMENT OF THE ISSUE PRESENTED ...................................6

COUNTERSTATEMENT OF THE CASE.......................................................6

    Relevant Procedural History ................................................................6

        A.    Initial Procedural History.........................................................7

        B.    *Wang I* ................................................................................7

        C.    This Court's Decisions in *Glatt* and *Wang I* ..............................9

        D.    The Opinion Below ...............................................................10

    Facts Relevant to the Issue Presented for Review .........................................12

        Appellant Rappaport.............................................................12

        Appellant Spencer ...............................................................14

        Appellant Wagster...............................................................15

        Appellant Wang...................................................................16

        Appellant Wheels ................................................................17

    SUMMARY OF THE ARGUMENT ....................................................18

ARGUMENT .................................................................................20

I.  Under the *Glatt* Primary Beneficiary Analysis, *Bona Fide*
    Educational Internships Are Not FLSA Employment
    Relationships .....................................................................20

II. The District Court Did Not Err in Granting Summary
    Judgment to Hearst Because Appellants Had *Bona Fide*
    Educational Internships ....................................................23

    A.  There Is No Dispute That Each Appellant Accepted an
        Internship Understanding That It Was Unpaid and Did
        Not Guarantee a Job (Factors 1 & 7) .........................26

    B.  There Is No Dispute That Each Appellant's Internship
        Was Approved for Academic Credit (Factor 3).........28

    C.  There Is No Dispute That Each Appellant Received
        Hands-On and Other Educational Training (Factor 2) ............30

        i.   Appellants' Internships Provided Them With the
             Sort of "Real World" Training Experiences
             Contemplated by *Glatt*....................................31

        ii.  Appellants' "Evidence" About Non-Analogous
             Classroom Experiences Is Legally Irrelevant................36

    D.  There Is No Dispute That Each Appellant's Internship
        Corresponded to the Academic Calendar (Factor 4) ...............37

    E.  There Is No Dispute That Each Appellant's Internship Was
        Limited to the Period of Beneficial Learning (Factor 5) .........39

    F.  There Is No Dispute That Each Appellant's Internship
        Complemented, Rather Than Displaced, Paid
        Employees (Factor 6)...............................................42

    G.  Appellants Were Not Employees as a Matter of Law .............45

III.  Resolving Appellants' FLSA Employment Status on Summary
      Judgment Is Proper as a Matter of Law and Necessary as a
      Matter of Policy ......................................................................................48

      A.   Courts Properly Weigh and Balance Facts to Grant
           Summary Judgment Under Balancing Tests
           Like *Glatt* ..................................................................................49

      B.   Summary Judgment Is Necessary to Avoid Unworkable
           Trials and Protect *Bona Fide* Internship Programs ...................52

CONCLUSION .......................................................................................................55

CERTIFICATE OF COMPLIANCE .......................................................................56

CERTIFICATE OF SERVICE ................................................................................57

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Barfield v. N.Y.C. Health & Hosps. Corp.*,
   537 F.3d 132 (2d Cir. 2008) ........................................................................2, 51

*Blair v. Wills*,
   420 F.3d 823 (8th Cir. 2005) ............................................................................47

*Brock v. Superior Care, Inc.*,
   840 F.2d 1054 (2d Cir. 1988) ..........................................................................49

*Brown v. N.Y.C. Dep't of Educ.*,
   755 F.3d 154 (2d Cir. 2014) ......................................................................26, 51

*Deebs v. Alstom Transp., Inc.*,
   346 F. App'x 654 (2d Cir. 2009) ......................................................................36

*Glatt v Fox Searchlight Pictures, Inc.*,
   293 F.R.D. 516 (S.D.N.Y. 2013) ......................................................................26

*Glatt v. Fox Searchlight Pictures, Inc.*,
   811 F.3d 528 (2d Cir. 2016) ....................................................................*passim*

*Goenaga v. March of Dimes Birth Defects Found.*,
   51 F.3d 14 (2d Cir. 1995) ................................................................................44

*Hana Financial, Inc. v. Hana Bank*,
   135 S. Ct. 907 (2015).......................................................................................51

*Hollins v. Regency Corp.*,
   144 F. Supp. 3d 990 (N.D. Ill. 2015).........................................................22, 50

*Johnson v. Holder*,
   564 F.3d 95 (2d Cir. 2009) ..............................................................................25

*Kaplan v. Code Blue Billing & Coding, Inc.*,
   No. 12-12011, 2013 WL 238120 (11th Cir. Jan. 22, 2013) ..............................50

*Mark v. Gawker Media LLC*,
   No. 13-cv-4347, 2016 WL 1271064 (S.D.N.Y. Mar. 29, 2016) .................47, 50

*Marshall v. Baptist Hospital, Inc.*,
   473 F. Supp. 465 (M.D. Tenn. 1979)............................................................33, 44

*Meyer v. U.S. Tennis Ass'n*,
   607 F. App'x 121 (2d Cir. 2015) ........................................................49, 50, 52

*Meyer v. U.S. Tennis Ass'n*,
   No. 1:11-cv-6268, 2014 WL 4495185 (S.D.N.Y. Sept. 11, 2014)....................50

*Patterson v. Cty. of Oneida, N.Y.*,
   375 F.3d 206 (2d Cir. 2004) ..............................................................................29

*Pippins v. KPMG LLP*,
   759 F.3d 235 (2d Cir. 2014) ..............................................................25, 34, 51

*Regents of Univ. of Mich. v. Ewing*,
   474 U.S. 214 (1985)..............................................................................22, 53

*Reich v. Parker Fire Prot. Dist.*,
   992 F.2d 1023 (10th Cir. 1993) ........................................................................50

*Saleem v. Corp. Transp. Grp. Ltd.*,
   52 F. Supp. 3d 526 (S.D.N.Y. 2014) ................................................................51

*Schumann v. Collier Anesthesia, P.A.*,
   803 F.3d 1199 (11th Cir. 2015) .....................................................40, 41, 47, 54

*Secretary of Labor v. Lauritzen*,
   835 F.2d 1529 (7th Cir. 1987) ..........................................................................51

*Solis v. Laurelbrook Sanitarium & Sch., Inc.*,
   642 F.3d 518 (6th Cir. 2011) ..............................................................46, 47, 52

*Tony & Susan Alamo Found. v. Sec'y of Labor*,
   471 U.S. 290 (1985)...........................................................................................27

*Velez v. Sanchez*,
   693 F.3d 308 (2d Cir. 2012) ..................................................................*passim*

*Vlad-Berindan v. N.Y.C. Metro. Transit Auth.*,
   No. 14-cv-10304, 2016 WL 1317700 (S.D.N.Y. Apr. 1, 2016)........................51

*Walling v. Portland Terminal Co.*,
    330 U.S. 148 (1947)............................................................4, 22, 24, 27

*Wang v. Hearst Corp.*,
    203 F. Supp. 3d 344 (S.D.N.Y. 2016) (SPA1-17).....................................*passim*

*Wang v. Hearst Corp.*,
    293 F.R.D. 489 (S.D.N.Y. 2013) .........................................................7

*Wang v. Hearst Corp.*,
    617 F. App'x 35 (2d Cir. 2015) ................................................*passim*

*Wirtz v. Wardlaw*,
    339 F.2d 785 (4th Cir. 1964) ..............................................................44

*Zheng v. Liberty Apparel Co.*,
    355 F.3d 61 (2d Cir. 2003) ........................................................*passim*

## Statutes

28 U.S.C. § 1292(b) ...................................................................7

## Other Authorities

DOL Opinion Letter, 1995 WL 1032496 (July 11, 1995)........................................22

DOL Opinion Letter, 1996 WL 1031777, at *1 (May 8, 1996) ..............................22

Malcolm Gladwell, *Outliers: The Story of Success* 35 (2008) .................................40

*Merriam-Webster Dictionary*, https://www.merriam-
    webster.com/dictionary/complement (last visited Apr. 6, 2017) .......................42

*Merriam-Webster Dictionary*, https://www.merriam-
    webster.com/dictionary/displace (last visited Apr. 6, 2017) .............................42

## **INTRODUCTION**

Noticeably absent from Appellants' brief is any mention of their previous trip to this Court, although it bears heavily on their current arguments. *Wang v. Hearst Corp.*, 617 F. App'x 35 (2d Cir. 2015) ("*Wang I*"). Appellants' unsuccessful first appeal of the District Court's denial of their motions for summary judgment and class certification was heard in tandem with *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528 (2d Cir. 2016), and resulted in this Court's adoption of the standard for determining whether an intern is an employee under the Fair Labor Standards Act ("FLSA"). Unable to prevail under that standard, Appellants repackage arguments for a different standard made during their first appeal, failing to acknowledge that those arguments have already been rejected by this Court.

In *Glatt*, this Court held that an intern's FLSA employment status turns on "whether the intern or the employer is the primary beneficiary of the relationship"—a standard that "best reflects the economic realities of the relationship between intern and employer." *Glatt*, 811 F.3d at 535-36. It also identified seven non-exclusive factors to help district courts analyze that question, recognizing that educational experiences that benefit interns more than hosts are not employment. *Glatt* is the latest in a long line of cases in which this Court has employed multi-factor tests to assess the economic reality of claimed employment

contexts, from domestic worker to independent contractor.  *See Velez v. Sanchez*, 693 F.3d 308, 326-30 (2d Cir. 2012); *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 142 (2d Cir. 2008); *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 72 (2d Cir. 2003).  Utilizing these tests, FLSA employment status is routinely determined on summary judgment where, as here, the material facts are not in dispute.

Accordingly, after Appellants' first appeal, this Court expressly instructed the District Court to determine whether, under its new *Glatt* test, "plaintiffs established that they were FLSA employees ***as a matter of law***."  *Wang I*, 617 F. App'x at 37 (emphasis added).  On remand, the District Court did just that, assessing each *Glatt* factor, including whether the intern expected compensation or a job at the end of the internship, the nature and duration of the training and other educational benefits provided to the intern, whether the internship was integrated with the intern's formal education (such as by receipt of academic credit) and accommodated the academic calendar, and whether the intern's work complemented (or displaced) the work of paid employees.  *Glatt*, 811 F.3d at 536-37.  In a well-reasoned opinion, based on an undisputed record, the District Court concluded that Appellants were ***not*** Hearst's employees as a matter of law.  That judgment should be affirmed.

- 2 -

As that decision shows, this is an easy case under *Glatt*. Appellants were all students, their internships were limited to a school semester or summer break, and their internships were deemed educational by an accredited college that approved them for academic credit. These facts alone indicate that Appellants' internships were educationally beneficial—under well-established Supreme Court precedent, it is not the role of judges and juries to second-guess the academic judgments of Appellants' schools.

Beyond the schools' approval, Appellants sought and accepted their internships knowing that they would not be paid or receive a job at the end, because they would get to learn in a real-world work setting through hands-on training and on-the-job experience. They received these benefits in spades: integrated into the operations of a magazine department, Appellants learned specific skills and work flows relevant to that department, the department's overall function within magazine publishing, professionalism and responsibility, which aspects of magazine work did (or did not) appeal to them, and more. Thus, at the time, Appellants described their internships as, *e.g.*, "a rich and well-rounded learning experience," "a very valuable learning experience," and "exceed[ing] expectations."

These undisputed facts leave no room for doubt that Appellants were the primary beneficiaries of their internships, not Hearst. Compare them to *Glatt*

- 3 -

itself: *Glatt* involved two college graduates who, unlike Appellants, had film industry internships that were ***not*** approved for academic credit and were wholly untethered from the academic calendar. Yet this Court recognized that even those non-academic internships could prove sufficiently educational and beneficial to the interns so as not to constitute employment.

In this case, by contrast, ***all*** of the guiding *Glatt* factors weigh in favor of Hearst. *See* 811 F.3d at 535-37. It is particularly "significant" under this Court's law that there was no expectation of compensation at all. *Velez*, 693 F.3d at 330; *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947). Appellants did not work with the promise or expectation that Hearst would pay them a salary or that they would receive "wages in another form" (*e.g.*, "food, clothing, shelter"). *Velez*, 693 F.3d at 328-29. They came as students for a limited time for their own purposes, to receive the "hands-on" and "real-world" educational experiences contemplated by *Glatt*, and that is precisely what they got.

Because Appellants cannot prevail unless this Court rejects virtually all of Judge Oetken's analysis, they attempt a re-do of their first appeal by arguing again for the same rigid one-factor legal standard they unsuccessfully urged in *Wang I* and this Court rejected in *Glatt*: namely, did the internship provide an "immediate advantage" to Hearst or did it instead mimic a closely-supervised classroom experience? They also argue that summary judgment is ***never*** appropriate under

*Glatt* because it requires courts to evaluate and weigh undisputed evidence. Appellants seek to prove too much. Their deliberate misreading of Second Circuit law would render summary judgment impossible in most FLSA cases, which often depend on similar multi-factor analyses. That is not the law, nor would it benefit anyone, least of all student interns. Appellants' argument would have the consequence of putting jurors in the regular business of reevaluating colleges' educational judgments and inserting themselves into the hourly operations of companies to determine internships' educational value, all years after the fact. The strains on the judicial system, host companies, and interns would be untenable, and likely bring an end to unpaid internships in the private sector, chiefly to the detriment of the students who seek internships for the educational benefits they provide.

Fortunately, *Glatt* requires a different outcome: affirming the District Court's judgment that Appellants are not employees as a matter of law.

## COUNTERSTATEMENT OF THE ISSUE PRESENTED

Whether the District Court correctly determined that, as a matter of law, Appellants were not employees of Hearst for purposes of the FLSA and the New York Labor Law ("NYLL") under the standard set forth in *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528 (2d Cir. 2016), after drawing all reasonable factual inferences in favor of Appellants.

## COUNTERSTATEMENT OF THE CASE

The District Court granted summary judgment for Hearst on one issue: Appellants were not "employees" under *Glatt*, which this Court adopted in conjunction with denying Appellants' prior appeal. (Special Appendix ("SPA") 1-17 (reported at *Wang v. Hearst Corp.*, 203 F. Supp. 3d 344 (S.D.N.Y. 2016) (Oetken, J.).) Appellants now challenge that decision, which faithfully followed this Court's instructions in applying the *Glatt* test to the facts of Appellants' internships to determine "whether plaintiffs established that they were FLSA employees as a matter of law." *Wang I*, 617 F. App'x at 37.

**Relevant Procedural History.**

Although the *Glatt* standard was adopted as a direct response to Appellants' appeal in *Wang I* and rejected the arguments Appellants now make to this Court, Appellants' Statement of the Case ignores that appeal and the rest of the five-year history of this case. That procedural history informs the issues before this Court.

- 6 -

## A.    Initial Procedural History.

On February 1, 2012, lead plaintiff Xuedan Wang filed this suit alleging that she and a putative class of interns across Hearst's magazine departments were deprived of wages in violation of the FLSA and NYLL.  The District Court (Baer, J.) provisionally granted collective certification under the FLSA's lenient standard; seven former interns ultimately opted in, resulting in a collective of eight plaintiffs (including Appellants).  Following extensive discovery, those plaintiffs moved for partial summary judgment and class certification.

The District Court denied plaintiffs' motions after concluding that the legal standard for determining whether interns are covered by the FLSA and NYLL is a primary beneficiary test based on the totality of the circumstances.  *Wang v. Hearst Corp.*, 293 F.R.D. 489 (S.D.N.Y. 2013).  In applying that test, the Court considered six factors set forth in the Department of Labor's April 2010 "Fact Sheet #71" addressing internships ("DOL Factors").  *Id.* at 493.  The Court rejected plaintiffs' argument for a test focused only on whether the intern provided an "immediate advantage" to the host company.  *Id.*

## B.    *Wang I.*

On July 10, 2013, plaintiffs filed a petition under 28 U.S.C. § 1292(b) for determination of the legal standard applicable to their claims.  (No. 13-2616-cv.) This Court granted that petition and ordered that it be considered with *Glatt v. Fox*

*Searchlight Pictures, Inc*., No. 13-4478-cv (No. 13-4480-cv, ECF No. 3), which

concerned internships that were not approved for school credit and did not coincide

with the academic calendar. *See Glatt*, 811 F.3d at 532.

Plaintiffs' counsel (who also represented the *Glatt* plaintiffs) urged this

Court to adopt the same "immediate advantage" standard the District Court had

rejected. In the alternative, plaintiffs argued for a checklist-style application of the

DOL Factors under which ***all*** factors must be satisfied for an intern to fall outside

the FLSA. (No. 13-4480-cv, ECF No. 59 at 37-40.) Among other things, plaintiffs

and their *amici* argued (as they do now) that their preferred standards were

appropriate given the FLSA's "expansive scope" and broad definition of

"employee," and that unpaid internships have negative economic effects without

providing educational benefits. (*Id.* at 24-34; No. 13-4480-cv, ECF No. 99 at 6-

23.)

On the other hand, Hearst argued that interns' employment status should be

evaluated through a flexible primary beneficiary approach that takes into account

the totality of the circumstances. (No. 13-4480-cv, ECF No. 112 at 14-27.) While

certain DOL Factors might inform the primary beneficiary analysis, Hearst argued,

an internship need not meet all of them to fall outside the FLSA. (*Id.* at 17-23, 42.)

## C.    This Court's Decisions in *Glatt* and *Wang I*.

On July 2, 2015, this Court issued its opinions in *Glatt* and *Wang I*.[1]  *Glatt* rejected plaintiffs' standards and adopted the flexible primary beneficiary analysis urged by Hearst, which recognizes "[t]he purpose of a bona-fide internship is to integrate classroom learning with practical skill development in a real-world setting."  811 F.3d at 537.  This Court provided seven "non exhaustive" factors to guide that analysis, which reflect the DOL Factors in certain respects but exclude "close supervision [by] existing staff" and that the "employer . . . derive[] no immediate advantage from the activities of the intern" from the inquiry.  *Id.* at 534.

In *Wang I*, this Court reaffirmed its rejection of plaintiffs' urged standard and directed the District Court to "determine in the first instance, in light of *Glatt*, whether plaintiffs established that they were FLSA employees as a matter of law." *Wang I*, 617 F. App'x at 37.

Plaintiffs in both cases sought *en banc* review, urging again an "all or nothing" test focused solely on whether they provided any "immediate advantage" to their hosts.  (No. 13-4480-cv, ECF No. 175.)  The petition was rejected, and this case remanded.  (No. 13-4480-cv, ECF Nos. 181, 182.)

---

[1] This Court issued a slightly amended opinion in *Glatt* on January 25, 2016, at 811 F.3d 528, which is the controlling opinion cited herein.

### D. The Opinion Below.

Following remand, two of the then-eight plaintiffs voluntarily dismissed their claims with prejudice. (No. 12-cv-00793, ECF No. 179.) On January 29, 2016, Hearst moved for summary judgment against the six remaining plaintiffs under the new *Glatt* test. Although plaintiffs opposed Hearst's motion, they admitted virtually all of Hearst's Statement of Undisputed Facts (many of which mirrored word-for-word facts plaintiffs presented on their earlier failed summary judgment motion). (*Compare* JA739-787 *with* No. 12-cv-00793, ECF No. 108 at 18-32, 40-49.) Plaintiffs did not renew their motion for summary judgment.

On August 24, 2016, the District Court (Oetken, J.) issued an order and opinion applying the *Glatt* test to grant Hearst's motion. (SPA1-17.) The District Court correctly recognized that *Glatt* focuses on the "educational and vocational benefits" that interns receive through "hands-on" and "practical" experience and training (SPA8-11), and applied the test in light of that focus.

Following this Court's instruction to "weigh[] and balanc[e] all of the circumstances," *Glatt*, 811 F.3d at 537, the District Court reviewed the full record, including the many undisputed facts. (*See* SPA2-7 (citing JA726-812).) It considered those facts in the light most favorable to plaintiffs and drew all reasonable inferences in their favor. For instance, the District Court inferred, based on the tasks themselves, that the internships involved some "rote" tasks and

that there were features of each plaintiff's internship that qualified as "scut work." (SPA11, 15-17.)  The District Court also considered other facts that plaintiffs argued weighed in their favor—*e.g.*, that plaintiffs believed they were not always supervised and that Wang deferred her graduate studies to take an internship—but correctly found that these facts were either irrelevant or only minimally significant under *Glatt*.  (SPA11, 13.)

The Court also acknowledged that the vast majority of the material undisputed facts favored Hearst: all plaintiffs "worked at Hearst magazines for academic credit, around academic schedules . . . with the understanding that they would be unpaid and were not guaranteed an offer of paid employment," and all plaintiffs "learned practical skills and gained the benefit of job references, hands-on training, and exposure to the inner workings of industries in which they had each expressed an interest."  (SPA16-17.)  This led the District Court to find that five *Glatt* factors favored Hearst for all plaintiffs while just one factor favored plaintiffs, and to conclude—correctly—that the undisputed facts leave no room for doubt that "Plaintiffs were interns rather than employees as a matter of law." (SPA9-17.)  To achieve reversal, therefore, Appellants face a steep climb.

Five plaintiffs—Rappaport, Spencer, Wagster, Wang, and Wheels ("Appellants")—timely appealed the grant of summary judgment.

- 11 -

**Facts Relevant to the Issue Presented for Review.**

The facts relevant to Appellants' employment status during their internships are fully developed in the record and largely undisputed. (JA739-786(¶¶34-214).)[2] During the time period at issue, Hearst maintained dozens of internship programs across its magazine departments (JA727(¶2); JA77-92; JA107-116; JA136-145), which were available only to students who received prior approval for college credit.[3] Over 100 colleges approved Hearst's internships for credit during that period (JA728-730(¶4)), and each Appellant's internship was among those approved (JA742-779(¶¶43-44, 69, 76, 117-118, 149-150, 182)). Additional undisputed facts of each Appellant's internship follow.

**Appellant Rappaport.**

Alexandra Rappaport interned in *Seventeen*'s fashion department in summer 2011, while a student at Lafayette College. (JA739(¶¶34-35).)[4] She majored in International Affairs, but was interested in a possible career in fashion. (JA739-

---

[2] Appellants previously presented many of these same facts on their prior appeal. (*See* No. 13-4880-cv, ECF No. 59 at 10-19.)

[3] Hearst Magazines Human Resources instructed the magazines to obtain letters from students' educational institutions demonstrating that students would receive academic credit for their internships. (JA727-728(¶3).)

[4] A magazine's fashion department includes a "fashion closet" containing clothing and other samples that might be featured in magazine stories. (*See* JA490-491(161:16-162:3); JA81(¶16); JA138(¶¶6-7); JA143(¶16).) The fashion closet must keep close track of samples while at the magazine and when they are returned to designers. (JA772(¶¶155-156); JA143(¶16).)

742(¶¶34, 39, 42).)  Lafayette did not offer fashion courses, so Rappaport chose *Seventeen* "to get a real-life experience."  (JA740-742(¶¶39-42).)

Lafayette awarded Rappaport credits equivalent to one class for the internship.  (JA742(¶44).)  To receive them, she had to "pitch" the internship to a professor who then "signed off" on the experience, respond to the professor's questions about the internship, and complete journal entries and a final paper. (JA742-743(¶¶45, 47).)  Lafayette also required that Rappaport not be paid for the internship.  (JA742(¶46).)

During her internship, Rappaport cataloged and managed samples in the fashion closet, created fashion invoice spreadsheets, helped prepare for and attended photo shoots, assisted stylists, corresponded with and went on "runs" to public relations companies and designers to pick up samples and other items, and performed some administrative and organizational tasks.  (JA743(¶¶49-51).)  In addition to gaining knowledge "vital" to a fashion career and learning how much goes into a magazine, the internship accomplished Rappaport's goal of exploring careers:  while she learned "many good life skills . . . [,] how to be more organized and focused[,] . . . [and] now know[s] how to maximize [her] strengths and use them to [her] advantage," she "realized . . . [she] do[es] not want to work in fashion."  (JA184(148:9-149:11); JA743-745(¶¶52-55); JA246.)

**Appellant Spencer.**

Erin Spencer interned four days a week in the *Cosmopolitan* bookings department in summer 2010. (JA747(¶¶63-64).)[5] As a Fashion Merchandising major at Howard University, Spencer was required to complete an internship as a graduation requirement—which her *Cosmopolitan* internship fulfilled—and enroll in a "Fieldwork" course that "provides supervised work experience in an approved work setting . . . ." (JA747-748(¶¶63, 71).) Howard described its internship requirement as an opportunity for students to "apply the theories, principles, and learning experiences given during your undergraduate education in a non-academic setting" and "develop a better understanding of the operation of a business." (JA748-749(¶¶71-72).)

Spencer described to Howard her expected "duties and activities" at *Cosmopolitan*, which included assisting with model castings, assembling and filing model profile packets, corresponding with agencies and bookings directors, filing invoices and other forms, and some administrative tasks. (JA352-364; JA749(¶73).) During her internship, Spencer did all this and more, including attending a photo shoot and gaining exposure to a fashion closet. (JA751-754(¶¶79, 84-90).)

---

[5] The bookings department is responsible for casting models for photo shoots. (JA261-262(45:24-46:2).)

Howard awarded Spencer six credits for her internship and related coursework, including a final report, an employee interview, and a mid-term "Interim Evaluation Form" that described participating in her internship duties as "a very valuable learning experience for me . . . ." (JA335-350; JA366; JA748-751(¶¶69, 74-76, 79-80).)

**Appellant Wagster.**

Matthew Wagster interned in *Esquire*'s marketing department from July to December 2009. (JA760(¶111).) Wagster was then a Political Science major at the University of Colorado, but also harbored an interest in fashion. (JA760-761(¶¶110, 116).) In obtaining his *Esquire* internship, Wagster represented to Hearst that he would receive academic credit for the experience. (JA761-762(¶¶117-118).) Wagster generally interned three days a week at *Esquire* (JA760(¶111)), during which he gained real-world experience, learned professionalism, and learned how *Esquire* works by organizing and setting up marketing events, providing social media content from some events, attending marketing meetings, helping prepare expense reports, and performing some administrative tasks (JA762-766(¶¶121-125, 133, 134); JA419(161:9-24)). Wagster included his internship on his resume and spoke about it during a later interview for a job that he successfully obtained. (JA764(¶¶128-129).)

- 15 -

**Appellant Wang.**

Xuedan Wang was the "Head Accessories Intern" in the *Harper's Bazaar* "accessories closet" from August until December 2011. (JA767-768(¶¶137, 141).) Wang was then a recent graduate of Ohio State University ("OSU"), and "a recently accepted graduate student in the Fashion Marketing program at Parsons . . . ." (JA766-767(¶136).) She aspired to be a fashion stylist. (JA767(¶138).) After the Head Accessories Intern position was explained during her internship interview, Wang determined that she wanted to use a semester to intern full-time in that position. (JA768(¶¶140-141).) She sought academic credit from OSU and informed an OSU advisor of the tasks she would perform, including "cataloging and trafficking samples" and "maintaining [the] accessories closet." (JA552; JA770(¶¶148-149).) OSU approved Wang's internship for credit, and Wang provided Hearst with a letter stating that she would receive two credits upon completion of her internship. (JA555; JA770(¶150).)

Wang performed the tasks she described to OSU; she helped maintain the accessories closet (including overseeing other interns), communicated with designers and publicists, created storyboards for photoshoots, helped prepare for and assisted at photoshoots, and prepared expense reports (among other things). (JA771-773(¶¶152-159).) At the time, Wang described her internship as a "rich and well-rounded learning experience" and as "provid[ing] unrivaled skills for

- 16 -

working in fashion."  (JA775-776(¶¶167, 169).)

**Appellant Wheels.**

Sarah Wheels interned in *Cosmopolitan*'s editorial department four days a week during summer 2011, following her sophomore year at Reed College. (JA777(¶¶173-174).)  Wheels pursued that internship because she was an English Literature major interested in writing and believed having *Cosmopolitan* on her resume could be helpful in applying for future jobs.  (JA777-778(¶¶173, 178-179).) Because Reed does not provide internship opportunities, Wheels sought and received credit for her internship from Portland Community College ("PCC"), completing a "Cooperative Education Training Agreement."  (JA674-676; JA778-779(¶¶182, 185); JA595(104:4-21).)  During her internship, Wheels participated in the activities she described to PCC.  (JA779-781(¶¶185-189.) Among other tasks, she conducted research, short surveys and interviews, transcribed interviews, drafted "blurbs" and blog posts, pitched a story, attended "Cosmo U" sessions, and performed some administrative tasks.  (JA779-781(¶¶186-189); JA782-784(¶¶193-201).)  At the time, Wheels reported that interning "exceeded expectations," she "learn[ed] a whole lot," and was "pleasantly surprised to find that the work was as weighty as it was . . . ."  (JA678-680; JA784-786(¶¶203, 207, 211).)

# SUMMARY OF THE ARGUMENT

The only question here is whether Appellants were FLSA employees during their college-approved internships.[6]  The applicable legal standard was definitively decided in *Glatt*, and the material facts under that standard (as properly interpreted) are undisputed and establish that Appellants were *bona fide* interns.

*Glatt* holds that interns' employment status depends on a "primary beneficiary" analysis.  This standard reflects the "economic reality" of modern internships, which can provide interns with "appreciable benefit[s] in education or experience" through "practical skill development in a real-world setting . . . ."  811 F.3d at 535-37.  Under *Glatt*, educational internships do not create employment relationships, even if they benefit the host, and courts should consider the wide array of educational benefits and ways those benefits can be imparted in evaluating whether an internship meets this standard.

Here, Appellants do not dispute that: (a) no Appellant expected compensation for the internship; (b) each Appellant's internship was approved for academic credit; (c) each Appellant's internship lasted roughly a semester or summer break; and (d) no Appellant was guaranteed a job at the conclusion of their

---

[6]  This Court "construe[s] the NYLL definition as the same in substance as the definition in the FLSA," and applies FLSA cases to the question of an employment relationship under the NYLL.  *Glatt*, 811 F.3d at 534.  Accordingly, the arguments herein also apply to Appellants' NYLL claims.

- 18 -

internship.  As the District Court correctly recognized, these concessions (which tilt the first, third, fourth, fifth, and seventh *Glatt* factors towards Hearst) point to only one reasonable conclusion: that Appellants were not employees.  The District Court's conclusion is bolstered by the undisputed facts that Appellants did not take the job or position of any Hearst employee (the sixth factor) and each received "hands on" and "real-world" training and experience in magazine work (the second factor), which gave each of them the opportunity to gain practical skills and intangible knowledge about the industry, professionalism, and career paths.  Thus, under *Glatt*, no jury could conclude that Appellants were employees.

Appellants transparently resort to contorting the *Glatt* test into a different test, one **this Court already rejected on their prior appeal** (and declined to review *en banc*).  In doing so, Appellants suggest that summary judgment is never appropriate in any case that turns on an FLSA balancing test.  Appellants' arguments are contrary to *Glatt* and other law and would require all unpaid internships to be evaluated through multi-year litigation and intensive trials in which juries second-guess the academic judgments of colleges as to the educational benefit of specific internships.  This Court should reject these arguments and affirm the District Court's judgment that Appellants were never Hearst's employees.

**ARGUMENT**

I.  **Under the *Glatt* Primary Beneficiary Analysis, *Bona Fide* Educational Internships Are Not FLSA Employment Relationships.**

In *Glatt* and *Wang I*, this Court clarified that an intern is an FLSA employee "when the employer, rather than the intern, is the primary beneficiary of the parties' relationship." *Wang I*, 617 F. App'x at 36 (citing *Glatt*, 811 F.3d at 536).

Under the primary beneficiary analysis, *bona fide* educational internships are not FLSA employment. *Glatt* "focuses on what the intern receives in exchange for his work[,] . . . accords courts the flexibility to examine the economic reality as it exists between the intern and the employer. . . . [and] acknowledges that . . . the intern enters into the relationship with the expectation of receiving educational or vocational benefits that . . . may be a product of experience on the job." *Glatt*, 811 F.3d at 536 (citations omitted). It also recognizes that educationally beneficial internships may provide at least some benefit to the host company.

Courts accordingly must "weigh[] and balanc[e] all of the circumstances" of an internship to determine whether it is sufficiently educationally beneficial to fall outside the FLSA. *Glatt* enumerates seven "flexible" and "non-exhaustive" factors to help guide that analysis:

1. The extent to which the intern and the employer clearly understand that there is no expectation of compensation.

2. The extent to which the internship provides training that would be similar to that which would be given in an educational environment.

- 20 -

3. The extent to which the internship is tied to the intern's formal education program by integrated coursework or the receipt of academic credit.

4. The extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar.

5. The extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning.

6. The extent to which the intern's work complements, rather than displaces, the work of paid employees while providing significant educational benefits to the intern.

7. The extent to which the intern and the employer understand that the internship is conducted without entitlement to a paid job at the conclusion of the internship.

*Glatt*, 811 F.3d at 536-37. Because the ultimate primary beneficiary question turns on the totality of the circumstances, not the factors themselves, "every factor need not point in the same direction for the court to conclude that the intern is not an employee," and courts may consider additional evidence beyond the factors where appropriate. *Id.* at 537.

*Glatt* recognized that even ***non-academic*** internships can be sufficiently educational and beneficial to interns to pass muster under the FLSA, by reversing a grant of summary judgment for college graduates who had internships that were ***not*** approved for academic credit and were untethered from the academic calendar. But where internships are actually school-sanctioned, interns are more likely to be the primary beneficiaries of their internships. A college's approval of an internship for credit signifies that the school has determined the internship to be educationally

- 21 -

beneficial—something the DOL has long recognized by looking to credit as "the key factor in determining that an intern was not an employee . . . ."[7]  That judgment should not be second-guessed by a court.  *See, e.g.*, *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985); Brief of *Amici Curiae* American Council of Education, *et al.*, No. 13-4480-cv, ECF No. 138 ("ACE Br.") at 4, 15-16 (collecting cases).[8]  *Glatt* thus recognizes that academic approval is significant evidence that the parties' "economic reality" is not employment, but education, particularly when the intern is a student working for a short academic semester or break and does not expect compensation—a fact that on its own also strongly suggests an intern is not an employee.  *Glatt*, 811 F.3d at 537; *Portland Terminal*, 330 U.S. at 152.[9]

---

[7] (JA689-690(¶¶3-4).)  Even under the old DOL Factors, the DOL did "not believe that an employment relationship exists" when "students receive college credits applicable toward graduation . . . and the program involves the students in real life situations and provides the students with educational experiences unobtainable in a classroom setting . . . ."  DOL Opinion Letter, 1996 WL 1031777, at *1 (May 8, 1996); *see also* DOL Opinion Letter, 1995 WL 1032496 (July 11, 1995) (same).

[8] *See also Hollins v. Regency Corp.*, 144 F. Supp. 3d 990, 1000 (N.D. Ill. 2015), *appeal filed*, No. 15-3607 (7th Cir. Nov. 20, 2015) (academic credit is a "significant indicator that the [internship] should be viewed in the first instance as part of an academic relationship . . . .").

[9] *See also Velez*, 693 F.3d at 330 (existence of a salary arrangement is "significant" in determining FLSA employment).

In sum, under *Glatt*, an educationally beneficial internship with no expectation of compensation is not FLSA employment—even if an intern receives her education through on-the-job training and activities that also benefit her host company. As shown below, no reasonable jury could conclude that Appellants were FLSA employees under this standard.

## II. The District Court Did Not Err in Granting Summary Judgment to Hearst Because Appellants Had *Bona Fide* Educational Internships.

This is precisely the case in which summary judgment is required under *Glatt*. Appellants admitted virtually every fact in Hearst's Statement of Undisputed Facts, and concede that each Appellant's internship: (1) was approved for credit by an academic institution; (2) did not come with an expectation of compensation; (3) did not come with a guarantee of a regular job; and (4) was limited in duration to a short period that tracked the academic calendar. *See supra* at 12-17 and *infra* Parts II.A, B, D & E. Following this Court's instruction, the District Court "weigh[ed] and balanc[ed] all of the circumstances," *Glatt*, 811 F.3d at 537, and determined that plaintiffs had not "established that they were FLSA employees as a matter of law." *Wang I*, 617 F. App'x at 37.

The District Court got it right. Even drawing all factual inferences in Appellants' favor, these undisputed facts establish that each non-exhaustive *Glatt* factor favors Hearst, that each internship was an educationally beneficial experience, and that Appellants were the primary beneficiaries of those internships.

- 23 -

Because Appellants cannot dispute the case-dispositive facts, they revert to contesting the applicable legal standard, effectively seeking a do-over of *Wang I* and *Glatt*. They argue that the FLSA definition of "employee" should be construed "broadly" in light of the FLSA's purposes, Appellants' Br. 24-26 (and that this breadth requires strained interpretations of *Glatt*, *see, e.g.*, *id.* at 41-43, 49-50), ignoring that *Glatt* already decided exactly how to interpret "employee" in light of the FLSA's purposes in the internship context.[10] They contend, without basis and contrary to this Court's prior direction, that two factors (the first and seventh) are entitled to "little weight." Appellants' Br. 49-50; *see infra* Part II.A. And they ignore *Glatt*'s plain language in discussing the remaining factors, instead advancing the same rigid test advanced in *Wang I*: did the intern do productive work or provide an "immediate advantage" to Hearst, or did the internship instead mimic a closely-supervised classroom experience? *See Glatt*, 811 F.3d at 535-37.

---

[10] Appellants' *amici* make the same plea, arguing that ***all*** unpaid internships are likely to impose economic hardships on interns, especially those that are already poor, unlikely to impart significant economic benefits, and will incentivize employers to misclassify employees to protect their bottom line. Brief of *Amici Curiae* American Federation of State, County, and Municipal Employees, *et al.*, ECF No. 36 ("AFSCME Br.") 7-26. *Amici* and Appellants' counsel made these same arguments to this Court in *Wang I* and *Glatt* (*see supra* at p. 8), and the resulting *Glatt* test inherently takes account of the "economic realities" of unpaid interns and ***all*** of the policies underlying the FLSA—including its goal of increasing employment opportunities for inexperienced workers. *See Portland Terminal*, 330 U.S. at 151.

These questions were specifically rejected in *Glatt* and excised from the economic reality analysis. *Id.*

Indeed, **all** of Appellants' arguments boil down to legal disputes about the meaning of the governing standard, despite Appellants' efforts to cast them as fact issues to be resolved in their favor. Since the facts are undisputed, Appellants are at best able to dispute how those facts should be **characterized** in light of the *Glatt* factors, as well as the meaning of those factors. *See infra* Parts II.A-F. These are legal arguments, and cannot create fact issues under this Court's precedent. *See Pippins v. KPMG LLP*, 759 F.3d 235, 240, 249 (2d Cir. 2014) (arguments about what plaintiffs do "should be characterized in light of established legal criteria" and the meaning of those criteria do not present fact questions).

At the end of the day, Appellants' renewed argument for a rigid and rejected standard must be rejected. That ship has sailed—all that is left to do is apply the *Glatt* test, under its plain meaning, to the record in this case. *See generally Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) ("[W]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case.") (citation omitted). Under that test, which acknowledges that a *bona fide* internship provides educational benefits in a "real world setting" through "hands on" experience, Hearst is entitled to summary judgment.

- 25 -

**A.      There Is No Dispute That Each Appellant Accepted an Internship Understanding That It Was Unpaid and Did Not Guarantee a Job (Factors 1 & 7).**

There is no dispute that each Appellant took an internship understanding it was unpaid and would not entitle him or her to a job after the internship. Appellants accordingly concede that the first and seventh factors favor Hearst.  *See* Appellants' Br. 4 n.1, 49-50.

By enumerating these considerations as factors in *Glatt*, this Court already rejected Appellants' attempt to minimize them as "preclude[d]" by the FLSA's remedial purpose and entitled to "little weight."  *See* Appellants' Br. 49-50.  In fact, *Glatt* reversed a district court opinion that mirrored Appellants' argument, *see Glatt v Fox Searchlight Pictures, Inc.*, 293 F.R.D. 516, 534 (S.D.N.Y. 2013), and specifically acknowledged that, among all the factors, expectations about compensation can be case-dispositive, *Glatt*, 811 F.3d at 537 ("Any promise of compensation, express or implied, suggests that the intern is an employee—and *vice versa*." (emphasis added)).  This Court has similarly found payment expectations to be "significant" to FLSA coverage questions in other contexts.  *Velez*, 693 F.3d at 330; *see also Brown v. N.Y.C. Dep't of Educ.*, 755 F.3d 154, 165-67 (2d Cir. 2014).

Considering interns' expectation of compensation or future employment is neither "circular" nor contrary to the FLSA's purpose.  *See* Appellants' Br. 49-50.

The purpose of the FLSA is not to ensure that *everyone* who performs work is paid, as Appellants suggest, but rather to "to insure that every person *whose employment contemplated compensation* should not be compelled to sell his services for less than the prescribed minimum wage." *Portland Terminal*, 330 U.S. at 152 (emphasis added). In other words, the FLSA ensures that everyone who works for pay (not some other reason) is paid properly. *See also Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 302-03 (1985) (FLSA covers "only those who engage in [commercial activities] in expectation of compensation").[11] Thus, an intern who works specifically for educational benefit—and not for pay or a promised job—is not an FLSA employee. *See Glatt*, 811 F.3d at 535-37. This Court correctly recognized that interns' expectations about what they would receive from their internships speak directly to their employment status, and Appellants' attempt to minimize those facts (because they favor Hearst) ignores this Court's prior decisions.

---

[11] Appellants' own reliance on *Alamo* is ironic. *See* Appellants' Br. 50. In that case, the Supreme Court acknowledged that "an individual may work for a covered enterprise and nevertheless not be an 'employee,'" 471 U.S. at 299, and determined that the plaintiffs were employees precisely *because they expected compensation*, albeit compensation in the form of "food, shelter, clothing, transportation and medical benefits," *i.e.*, "wages in another form." *Id.* at 293, 301 (citation omitted). Because they expected compensation, they were employees, and could not waive the FLSA's protections.

**B.    There Is No Dispute That Each Appellant's Internship Was Approved for Academic Credit (Factor 3).**

There is likewise no dispute that each Appellant's internship was approved for academic credit by an accredited college, that each Appellant provided documentation to Hearst indicating that he or she would receive that credit, and that each internship provided opportunities to do the very types of work Appellants told their schools they would perform in seeking credit.[12]  Accordingly, the third factor—which looks to how "the internship is tied to the intern's formal education program by integrated coursework or the receipt of academic credit," 811 F.3d at 537—favors Hearst for each Appellant.

Appellants try to manufacture a dispute as to four interns, but they point only to "facts" that are legally irrelevant under *Glatt*.  Specifically, Appellants argue this factor favors Wang and Wagster because they ultimately did not receive their approved credit.  Appellants' Br. 37-38.  But because *Glatt*'s focus is on the opportunities and experiences that the internship provides to the student, *see supra* Part I, there is no principled reason to distinguish between school-sanctioned internships based on whether an intern actually receives pre-approved credit, unless denial of credit was due to a reevaluation of the educational value of the internship.  Any other interpretation would require courts to hold host companies

_____

[12] (JA742-781(¶¶43-51, 69-70, 73, 76, 79, 117-118, 121-124, 148-152, 181-183, 185-189).)

accountable for post-internship circumstances the company cannot control—an unworkable and unreasonable outcome.

Here, no reasonable jury could find Wang and Wagster failed to receive credit because Hearst's internships were found to be non-educational after initial approval. The undisputed facts show that Wang did not receive her approved credit because **she** failed to pay her OSU bills or otherwise pursue the credit.[13] And there is no admissible (non-hearsay) evidence that the reason Wagster failed to obtain credit was because "his college concluded that the internship was insufficiently educational . . . ." Appellants' Br. 38.[14] In fact, Wagster's college has continued to approve internships at *Esquire* for credit.[15]

Appellants similarly argue that this factor weighs in favor of Wheels because she received her credit from a community college, but offer no reason why the judgment of that institution should be accorded less weight than that of a private, four-year college like that from which Wheels graduated. *See* Appellants' Br. 38-

---

[13] (JA488-489(152:24-157:19); JA554-555; *see also* JA770-771(¶¶149-151).)

[14] Appellants rely only on Wagster's own hearsay testimony. Appellants' Br. 38 n.82 (citing JA803(¶¶335-336) (misconstruing hearsay testimony in Wagster's recent declaration (JA1399) and deposition transcript (JA383-384; JA410; JA421))). This inadmissible hearsay cannot be used to create a genuine dispute on summary judgment. *See, e.g.*, *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004).

[15] (*E.g.*, JA723.)

39.  In any event, there is no non-hearsay evidence that speaks to the reasons why Wheels's college did not sanction internships for credit.[16]  Appellants likewise argue that this factor weighs in favor of Rappaport because her internship was "unrelated to her international affairs major," but do not explain why this is material under *Glatt*, which did not require, for example, that host companies only provide editorial internships to journalism majors to avoid creating an employment relationship.  It is undisputed that Rappaport received credit for her internship from her college, which also required her to complete "integrated coursework" in the form of journal entries and a final paper.[17]  Indeed, the opportunity to explore careers and real-world experiences ***outside*** of an academic major is one of the greatest benefits of an internship.  *See generally* ACE Br. 17-18.

### C.     There Is No Dispute That Each Appellant Received Hands-On and Other Educational Training (Factor 2).

The second factor examines the "extent to which the internship provides training that would be similar to that which would be given in an educational environment . . . ."  *Glatt*, 811 F.3d at 537.  This factor, like the others, guides a court's analysis of whether an internship provides educational benefits by allowing an intern to "integrate classroom learning with practical skill development in a

---

[16] Again, Appellants rely only on Wheels's hearsay testimony.  *See* Appellants' Br. 39 n.83 (citing JA811(¶¶392-394) (citing hearsay testimony in Wheels's deposition transcript (JA595-596))).

[17] (JA742-743(¶¶44, 47).)

- 30 -

real-world setting . . . ." *Id.* It thus looks ***not*** at whether an internship closely

resembles an intern's "courses in school," as Appellants contend, Appellants' Br.

31, but whether it provides opportunities for hands-on learning of practical skills.

### i. Appellants' Internships Provided Them With the Sort of "Real World" Training Experiences Contemplated by *Glatt*.

Appellants' internships provided them with an opportunity to receive

valuable "real world" training and learning opportunities[18]—as schools recognized

by approving each internship for credit. Therefore, the District Court correctly

held that no reasonable jury could find that the second factor favors any Appellant.

(SPA9-11.) Each internship provided specific training in the practical aspects of

magazine publishing. For example,

- Wagster received training in magazine marketing and event planning by attending staff meetings, creating social media posts, and helping to organize marketing events.[19]

- Wheels received training in interview, research, writing, editing, and other editorial skills by conducting research and interviews, writing "blurbs and … blog posts," pitching stories, responding to reader emails, and fact-checking articles.[20]

- Wang, Rappaport, and Spencer received training in the mechanics of how a garment or accessory goes from a runway or showroom to a

---

[18] See nn.19-23, 25, *infra*, and citations therein.

[19] (JA762-766(¶¶120-125, 134); *see also* JA107(¶2), JA111(¶13); JA419(161:21-24); JA718-720(¶¶3, 6-7).)

[20] (JA779-783(¶¶185-189, 193-198); *see also* JA89-91(¶13, 18); JA695-697(¶¶3, 6, 8).)

magazine page, including how editorial judgments are made and what goes into a photo shoot, by cataloging and managing samples, communicating with publicists, creating storyboards, helping prepare for and attending photo shoots, casting models, and receiving input and feedback from the editorial staff.[21]

In addition, all Appellants' internships provided hands-on opportunities for developing organizational and office skills,[22] and some included more formal sessions like *Cosmopolitan*'s "Cosmo U" program—which Wheels found "super informative" and Spencer described as "[t]he most valuable experience I had."[23] Appellants' internships provided what *Glatt* contemplates: opportunities to learn "at least some tangible skills . . ., put those skills to use, and gain[] the intangible value of exposure to the practical realities of jobs in their respective fields." (SPA10.)

Appellants nevertheless contend that this factor could weigh in their favor because (a) their work was at times unsupervised; (b) they disagree with certain of the District Court's ***characterizations*** of the tasks they performed (but not the underlying facts); and (c) notwithstanding contemporaneous statements about the value of their internships, they now believe that the tasks they performed (even writing published blog posts) were "basic" and not "educational." Appellants' Br.

---

[21] (JA743-777(¶¶49-55, 57, 73, 79-89, 93-98, 100-102, 104-106, 142, 152-161, 166-172).)

[22] (*E.g.*, JA745-783(¶¶55, 73, 79, 121, 123, 155, 159, 189, 198).)

[23] (JA754-784(¶¶90-91, 199-202).)

32-36.  None of this is relevant, much less negates the undisputed training

opportunities presented by Appellants' internships.

*Glatt* does not require close supervision of interns at all times—it

specifically omits the DOL Factors' old requirement of "close supervision," and

instead recognizes that internships provide training through real-world work, not

classroom levels of supervision and feedback.  *See supra* pp. 8-9 & Parts I & II.C.[24]

And although employees may also receive this same type of real-world training,

*see* 811 F.3d at 536, Appellants are wrong that there is "no way" to distinguish

employees from interns (Appellants' Br. 32).  Among other things, academic

approval, a limited work period that coincides with the academic calendar, and a

lack of expectation of compensation or future employment all distinguish

internships from employment that also provides hands-on training.  *See supra* Parts

II.A-B and *infra* Part II.D.

---

[24] The only case Appellants cite as direct support for their strained
interpretation of this factor (and others) is a Tennessee district court case, *Marshall
v. Baptist Hospital, Inc.*, 473 F. Supp. 465 (M.D. Tenn. 1979), decided more than
35 years before *Glatt*.  Appellants' Br. 32, 41 (fifth factor), 46 (sixth factor).  That
case arose in the very different context of a clinical hospital training program for x-
ray technicians (a licensed profession) that bears no resemblance to the modern-
day corporate internship.  Among other things, trainees worked for the defendant
hospital for a full two years and received insurance and other benefits, and the
hospital was ***required*** by the accrediting agency to supervise the trainees at least
50% of the time.  Because the hospital failed to abide by the policies of the
accrediting agency, the court concluded the program was not educationally valid.

Nor does *Glatt* turn on former interns' subjective assessment of what they learned from the training opportunities presented to them, or whether they describe their tasks as "basic" or "educational." Like college courses and other educational opportunities, an internship's value to a student depends on the effort that the intern puts into it, and *Glatt* thus focuses on what opportunities the internship provides and not what interns ***believe*** they received upon reflection years later. Appellant's strained reading of *Glatt* would require host companies to survey student's abilities upon arrival at their internships and customize and track each intern's experience over the course of the semester to avoid asking them to participate in any task deemed subjectively "basic" by the student (even if that task was part of the company's everyday operations). Colleges are not required to customize course syllabi to each student; certainly internship host companies should not be either.

The critical question, then, is not how Appellants describe their work, but whether that work actually presented them with learning opportunities and hands-on training. *Cf. Pippins*, 759 F.3d at 240, 243-49 (holding that plaintiffs' characterization of their work and training, including that it was "rote," that it did not require a particular educational background, and that it was not "sufficiently intellectual" was irrelevant in determining whether they were exempt from overtime benefits under the FLSA). Here, even if some of Appellants' tasks were

- 34 -

"rote," they nonetheless constituted real-world training and were part of an overall experience pervaded with learning opportunity.

Moreover, Appellants' primary "evidence" that they learned little from their internships and were unsupervised consists of recent self-serving affidavits accompanied by argumentative, conclusory characterizations of facts that contradict their contemporaneous statements about the benefits of their internships and their prior sworn statements and binding admissions in this case. *See* Appellants' Br. 31-36 nn.63-79 (citing, *inter alia*, JA787-811, JA1391-1406).[25] Even if these *post-hoc*, subjective views were relevant, "self-serving" statements that contradict contemporaneous documentary evidence are "insufficient to defeat

---

[25] For instance, Spencer wrote in 2011 and admitted to the District Court in 2013 that she "was introduced to a lot of magazine terminology and 'how-tos' about breaking into the industry" (No. 12-cv-0973, ECF No. 133 ¶D168), that her internship "generously contributed to her overall career development" (*id.* ¶D169), that she learned a lot about books, models, and magazines in general (*id.* ¶D170), took away good advice on moving forward after her internship (*id.* ¶D164), improved her communication skills (*id.* ¶D176), gained knowledge and skills about booking that she believed could not be learned in a college class (*id.* ¶D180). Yet in response to Hearst's summary judgment motion, she self-servingly qualified her admissions to those same statements with extensive argument and explanation (JA754-759(¶¶91, 93-94, 100, 102, 104) and relied on a newly sworn declaration concluding that she "did not gain many valuable skills from my internship" and "did not learn much, if anything, [after the first two weeks of my internship]" (JA1396(¶¶7-8)). Other Appellants engaged in similar tactics. (*Compare* No. 12-cv-0973, ECF No. 133 ¶¶D76, D77, D211, D223, D228 *with* JA744-776(¶¶53, 55, 125, 140, 169).)

summary judgment." *Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009).

### ii. Appellants' "Evidence" About Non-Analogous Classroom Experiences Is Legally Irrelevant.

Attempting to twist the second factor in their favor, Appellants also contend—contrary to *Glatt*'s express language—that it "prompt[s] an inquiry into whether an intern's training resembled classes and coursework," Appellants' Br. 30, and argue that the District Court erred by failing to consider Appellants' *ex-post* observations that their internships did not resemble seminar classes, independent studies, thesis projects, or clinical law school courses in terms of "mentoring, supervision, and feedback." Appellants' Br. 29-31.

Not only was this comparison rejected by *Glatt*, which recognizes that internships are fundamentally ***not*** classroom experiences, but instead provide opportunities to get out of the classroom and gain "real-world" experience, 811 F.3d at 535-37, it also makes no sense in this context. Unlike law and other licensed professions, there are no vocational schools or specific clinical courses for magazine publishing. Nor does magazine work mimic the process of writing a thesis or independent study paper. Indeed, that is a real benefit of a magazine (or any career-focused) internship: it permits students to apply abstract ideas learned in a variety of college course work. Students get to observe how concepts learned in journalism, advertising, marketing, photography, business, fashion, accounting,

and other courses work in a real-world professional office setting, and they are able to observe how actual employees do their jobs. *See* ACE Br. 2, 4.[26] The fact that those internships did not resemble a seminar or even a law school clinic is irrelevant.

### D. There Is No Dispute That Each Appellant's Internship Corresponded to the Academic Calendar (Factor 4).

The fourth *Glatt* factor examines "[t]he extent to which the internship accommodates the intern's academic commitments by corresponding to the academic calendar." *Glatt*, 811 F.3d at 537. Appellants concede that: (a) Spencer, Rappaport, and Wheels interned during the summer breaks of their colleges' academic calendars; (b) Wagster interned three days a week for roughly a semester when he was not enrolled in any college courses (but represented to Hearst that he was receiving internship credit); and (c) Wang also interned for roughly a semester for which she claimed to be receiving academic credit, between her college graduation and graduate school matriculation.[27] No Appellant had any academic commitment that Hearst failed to accommodate. On these facts, there can be no genuine dispute on this factor.[28]

---

[26] (*See also* JA77-92; JA107-116; JA136-145.)

[27] Appellants' Br. 39-41; *supra* pp. 11-17.

[28] The fact that the District Court found this factor to be neutral as to Wang and Wagster, though incorrect for the reasons discussed *infra* Part II.F, only

- 37 -

Because this factor so clearly favors Hearst, Appellants again disregard its plain meaning, arguing instead that an intern's *choice* to forego other commitments during an internship is relevant and weighs against the host company. *See* Appellants' Br. 39-41. This is wrong on two levels. First, *Glatt* acknowledges that even where an intern lacks *simultaneous* academic commitments, an internship nonetheless can accommodate the intern's academic commitments *in other semesters* by corresponding to the semesters and breaks in the academic calendar. 811 F.3d at 537. Thus, this factor favors the host company when the internship corresponds to that calendar, even if the intern is not enrolled in other coursework during his or her internship. *Id.* This was true of each of Appellants' internships.

Second, it would be nonsensical to hold an intern's choices against a host company under this factor, which by its terms focuses on the host company's efforts to accommodate those choices, whatever they may be. If an intern chooses to minimize other academic commitments during a particular semester, the host company should not be penalized for accommodating that choice. As to Wang, while Appellants note that she postponed her graduate studies to intern full-time for a semester, Wang *chose* that internship over a part-time internship, preferring

---

confirms that it drew every inference in Appellants' favor in applying the *Glatt* test.

that experience to be her sole educational focus during the same semester period.[29]

Wang's decision—which there is no dispute she made freely—is irrelevant to this factor and should not weigh against Hearst, given that her internship, like the others, corresponded to the academic calendar and thereby accommodated any graduate commitments during the following semester.[30]

### E. There Is No Dispute That Each Appellant's Internship Was Limited to the Period of Beneficial Learning (Factor 5).

The fifth factor considers "[t]he extent to which the internship's duration is limited to the period in which the internship provides the intern with beneficial learning." 811 F.3d at 537. Again, each Appellant's internship was limited to roughly a semester or summer break, and each Appellant concedes that he or she gained practical skills, hands-on experience, and exposure to the industry during that period.[31] As the District Court correctly recognized, these facts leave no room for a reasonable jury to conclude that the fifth *Glatt* factor favors any of the Appellants. (SPA13-14.)

As a result, Appellants again dispute only the legal meaning of this factor— not any of the material facts—arguing that it requires limiting an internship to the

---

[29] (JA768(¶¶140-141).)

[30] (*See* JA767(¶137).)

[31] *See supra* pp. 11-17 and nn.19-23, 25, *infra* nn.36, 41-43, and citations therein.

time in which interns first learn the tasks they perform. Appellants' Br. 41-43.

But *Glatt* does not take such a narrow view of "beneficial learning"—it recognizes that interns benefit and learn through gaining "experience on the job" and "practical skill development." *Glatt*, 811 F.3d at 535-37. Neither of these benefits accrue instantly, even if an intern quickly learns how to perform some tasks. Interning for a few months, rather than a few weeks, teaches interns professionalism through regular work in an office and more fully exposes them to the workings of the industry. It also shows how the same task can differ one day from the next, depending on context, helping to develop a more acute attention to detail and a better understanding of how to perform that task in all its variations. And even with respect to more concrete duties, learning occurs in part through repetition over a period of time. *See, e.g.*, Malcolm Gladwell, *Outliers: The Story of Success* 35 (2008).

Moreover, as the Eleventh Circuit recently recognized in adopting the *Glatt* test, "designing an internship is not an exact science." *Schumann v. Collier Anesthesia, P.A.*, 803 F.3d 1199, 1213 (11th Cir. 2015). It would be impossible for a company to design an internship program that is exactly tailored to each individual's learning style and ability. Just as many schools forego the "tracking" of advanced learners when establishing the pace of a standard curriculum, *Glatt* requires no more of intern host companies when designing their programs. It

- 40 -

certainly does not require an intensive *ex post* hour-by-hour accounting of the tasks each individual intern learned during each day of her internship, let alone adjustments to the program based on his or her progress.  Like many of Appellants' other arguments, this would require courts to second-guess academic judgments about the length of an educationally beneficial internship.  This is all the more reason to acknowledge that the learning contemplated by *Glatt* accrues over a period of time, and to recognize the schools' approval of the summer- or semester-long internships at issue here.[32]

In any event, even if Appellants' unworkable reading of the fifth *Glatt* factor were correct, their claims that they "learned how to perform their mostly routine tasks within the first week or two of their internships" and "continued to perform largely the same duties until their internships ended" are supported only by the same inadmissible and conclusory evidence that they rely on under the second

---

[32] Appellants take issue with the District Court's reliance on *Schumann*, 803 F.3d at 1214, in finding that this factor cannot provide significant weight to plaintiffs unless their internships were "grossly excessive" in length.  Appellants' Br. 41-42.  Although that interpretation is not required for this factor to favor Hearst for the reasons already explained, it would effectively address the policy concerns discussed above.  And as the District Court found, there is no question that Appellants' semester- and summer-long internships were not "grossly excessive."  (SPA13-14.)

factor.[33]  Appellants' Br. 41-42; *see also supra* Part II.B.  The District Court did

not err in finding that *Glatt* factor five favors Hearst as a matter of law.

### F.  There Is No Dispute That Each Appellant's Internship Complemented, Rather Than Displaced, Paid Employees (Factor 6).

Finally, the sixth factor considers the extent to which the plaintiff's work

"complements, rather than displaces, the work of paid employees . . . ."  *Glatt*, 811

F.3d at 537.  This factor is also designed to help the court determine whether

internships provide the "hands on" educational benefits recognized by *Glatt*.  *See*

*supra* Part I.  Interns often acquire these benefits by assisting paid employees with

their work, which is precisely what this Court meant by work that "complements"

employees.  When interns assist employees, they benefit educationally while

simultaneously "supplement[ing]" the employees' work.[34]  Conversely, an intern

"displaces" a paid employee when he or she "take[s] the job or position" of that

employee.[35]  As the District Court correctly observed, an intern's "complementary"

work "can provide considerable benefits to the employer's business," and "there is

---

[33] *See* Appellants' Br. 41 n.90 (citing, *inter alia*, JA1392-1393; JA1395-1396; JA1404-1405; JA1408).

[34] Appellants' Br. 47 (citing "Complement", *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/complement (last visited Apr. 6, 2017)).

[35] "Displace", *Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/displace (last visited Apr. 6, 2017).

no reason why [it] cannot . . . be work that paid employees would need to do . . . in an intern's absence."  (SPA15.)

Here, each Appellant was assigned to do "complementary" work that benefitted him or her and sometimes supplemented employees' work.  Each came to the internship with few skills and no experience in the inner workings of a magazine and was assigned to assist employees for the purpose of learning the building blocks necessary for anyone new in the industry.[36]  Some of these assignments inevitably consisted of work that entry-level and other employees also performed.  At times these assignments provided some benefit to Hearst, and at other times they did not—after all, all Appellants lacked industry experience, four of them lacked a college degree, and two even testified that they needed *more* real work during their internships.[37]  But there is *no* evidence whatsoever that any Appellant was brought on to supplant a Hearst employee.[38]

---

[36] (*See, e.g.*, JA80-81(¶13); JA144(¶¶19-20); JA223; JA368-369; JA446-448; JA547-549; JA686-687; JA739-785(¶¶34, 39-42, 48-53, 59-60, 63, 65, 73, 79-89, 110, 114, 120-124, 138, 149, 152, 155-157, 161, 166-170, 173, 184-198, 207-210).)

[37] (*See, e.g.*, *supra* n.36 and JA774(¶162).)  Wagster, for example, estimates that he spent 50% of his time trying to solicit tasks because he did not have anything to do.  (JA411(126:22-127:24); JA764(¶126).)  Wheels likewise believes she would have benefitted from "more work" and that the magazine could have used *fewer* interns.  (JA615-616(187:11-15); JA784(¶¶204-205).)

[38] Because each Appellant would bear the ultimate burden of proving at trial that he or she was an employee and not an intern, Hearst met its burden by pointing to the "absence of evidence to support an essential element of [Appellants'] claim."

Once again, Appellants' argument to the contrary is based on a facially incorrect reading of *Glatt*: that if an intern worked on "assignments specific to Hearst's operations that benefited the company" or did "productive work . . . for the benefit of Hearst's employees," Appellants' Br. 43, 46, he or she has "displaced" employees. *See* Appellants' Br. 43-47. That is precisely the "immediate advantage" test that Appellants previously urged and this Court rejected and effectively excised from the DOL Factors. *See supra* at 8-9. It has no place in *Glatt*'s primary beneficiary analysis, which inherently assumes that an internship provides ***some*** benefit to a host company.[39]

Moreover, even if Appellants had created any genuine dispute that this single factor could weigh heavily in favor of any Appellant, because all of the other factors favor Hearst, summary judgment was appropriate. *See Glatt*, 811 F.3d at 537.

---

*Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). Appellants thus bore the burden of coming forward with "evidence that would be sufficient to support a jury verdict in [their] favor." *Id.* Appellants attempt to make much of evidence relating to the fashion department at Harper's Bazaar (such as a 2008 email addressing the use of couriers), but it is undisputed that only one of the appellants interned at Harper's Bazaar, years after the email in question. (JA766-767(¶136-37).) Moreover, that email (JA1242-1243) makes plain that the use of interns was to be the exception in rare cases of need. *See id.*

[39] In support of their "productive work" standard, Appellants cite only *Baptist Hospital*, which is neither binding nor persuasive as discussed *supra* n.24, and an even older case, *Wirtz v. Wardlaw*, 339 F.2d 785 (4th Cir. 1964), which did not involve school-sanctioned work, much less unpaid work; it involved clerical work for pay for an insurance salesman that had no relation to any school.

### G. Appellants Were Not Employees as a Matter of Law.

Even if all the *Glatt* factors did not weigh in Hearst's favor, the totality of the circumstances here, considered in the light most favorable to Appellants, leaves no doubt that Appellants were the primary beneficiaries of their internships—something the District Court correctly found after drawing inferences (which on the fourth and sixth factors were, in Hearst's view, without legal or factual basis) in Appellants' favor.[40] (SPA16-17); *Glatt*, 811 F.3d at 537; *see also Zheng*, 355 F.3d at 76-77 (to grant summary judgment for the defendant, "the Court need not decide that *every* factor weighs against [an employment relationship]").

Although Appellants claim that the educational benefits of their internships were "nil," Appellants' Br. 48, their self-serving conclusions can be disregarded, and the undisputed facts show otherwise. Each Appellant's internship was deemed beneficial by an accredited school that approved it for academic credit. That alone suggests Appellants' internships were educational, especially because they also worked for a short period tied to the academic calendar and did not expect compensation or a regular job. *See supra* Part I. Each internship also offered opportunities to develop practical skills in a real-world setting related to their field of study or a field they were interested in but for which their own colleges did not

---

[40] (*See* SPA13-16 (finding the fourth factor neutral as to Wang and Wagster because they were not enrolled in school contemporaneously with their internships, and finding the sixth factor weighs in favor of Appellants because they performed some "scut" work).)

provide exposure.[41]  And each provided further tangible and intangible benefits,

including:

- The opportunity to explore a possible career path without a long-term commitment, and to gain insight into what career he or she might want (or not want) to ultimately pursue;[42]

- Overall knowledge of the magazine industry and the functions and terminology of the specific departments in which Appellants interned;[43]

- Development of professionalism and responsibility, including through improved communication skills, working as part of a team, navigating a professional office environment, and gaining confidence in their abilities;[44] and

- Networking opportunities, career advice, contacts, job references, and resume enhancement.[45]

Appellants may not acknowledge these benefits, *see* Appellants' Br. 48-49, but

they are legally significant.  *See Solis v. Laurelbrook Sanitarium & Sch., Inc.*, 642

F.3d 518, 531-32 (6th Cir. 2011) (recognizing that real-world work experiences

---

[41] (*See, e.g.*, JA740-787(¶¶39, 42, 49-57, 65, 70-73, 79-106, 116, 120-124, 136, 138, 142, 152-161, 173, 178, 186-189, 193-201, 207-212).)

[42] (*See, e.g.*, JA741-784(¶¶40-42, 56, 72, 90-91, 100, 103, 114, 116, 124-125, 138, 160, 178, 191, 200-201).)

[43] (*See, e.g.*, JA743-786(¶¶49-54, 72-73, 79-89, 93-100, 104, 121-125, 134, 152-161, 166, 170-172, 184, 186-189, 194-201, 207-210, 213).)

[44] (*See, e.g.*, JA745-786(¶¶55, 61, 72, 83, 85, 94, 98, 101-102, 120, 134, 153-154, 160, 168-169, 184, 187, 193, 212).)

[45] (*See, e.g.*, JA746-786(¶¶58, 90-91, 101, 103, 107-109, 128-130, 153, 163-165, 179, 191-192, 206, 212).)

provide intangible benefits relevant to a primary beneficiary analysis, including the "responsibility and the dignity of manual labor," the "importance of working hard and seeing a task through to completion," and "leadership skills and work ethic"). In fact, the value of these intangible benefits can be "significant enough to tip the scale of primary benefit in the students' favor even where the [host] receives tangible benefits from the students' activities." *Id.*; *cf. Blair v. Wills*, 420 F.3d 823, 829 (8th Cir. 2005) (chores performed by students could "instill in each student a sense of teamwork, responsibility, accomplishment, and pride").

On the other hand, there is no evidence that Appellants' work at Hearst, while at times "productive," was so significant as to offset the considerable benefits Appellants received. Nor is there any suggestion that any of the tasks Appellants performed were so "beyond the bounds of what could fairly be expected to be part of the internship" that they did not serve to, at a minimum, expose Appellants to the inner workings of a magazine. *Schumann*, 803 F.3d at 1214-15.[46] Appellants' assignments were all related to magazine production and marketing.

---

[46] *See also Mark v. Gawker Media LLC*, No. 13-cv-4347, 2016 WL 1271064, at *12-13 (S.D.N.Y. Mar. 29, 2016) (explaining that the overall primary beneficiary inquiry should "focus on the benefits to the student while still considering whether the . . . employer . . . takes unfair advantage of or is otherwise abusive towards the student" because *Glatt* is focused on "what the intern receives in exchange for his work" and intends that "'bona fide' internships fall outside the scope of the FLSA") (quoting *Schumann*, 803 F.3d at 1211).

On these facts, and under a proper interpretation of *Glatt*, *see supra* Part I,

no reasonable jury could conclude that Appellants were employees rather than

*bona fide* interns.  The District Court's grant of summary judgment to Hearst

should be affirmed.

### III.     Resolving Appellants' FLSA Employment Status on Summary Judgment Is Proper as a Matter of Law and Necessary as a Matter of Policy.

Because their positions have no support in the record, *see supra* Part II,

Appellants repeatedly and disingenuously suggest that summary judgment is

unavailable in most FLSA cases, claiming that "coverage questions are almost

always jury questions" especially under balancing tests like *Glatt*, Appellants' Br.

26, and arguing that a court cannot weigh undisputed facts to evaluate the

"existence and degree" of factors under such tests, Appellants' Br. 2, 4, 24.[47]  This

is not, and cannot be, the law.

---

[47] In arguing that such weighing is improper on summary judgment, Appellants repeatedly cite this Court's observation in *Zheng*, 355 F.3d at 76, that "findings as to the existence and degree of each factor . . . are findings of fact . . . ." One does not follow from the other.  The *Zheng* court was observing that findings as to the existence and degree of economic reality factors were factual findings for purposes of appellate review after a trial, when they "must be accepted . . . unless clearly erroneous."  *Id.* at 76.  Elsewhere, the court explained how a multi-factor balancing test is treated on summary judgment:  "both the historical facts and the [existence and degree of the] relevant factors are interpreted in the light most favorable to [non-moving] plaintiffs . . . ."  *Id.*  A court must, of course, weigh underlying facts even in interpreting the existence and degree of factors in the most favorable light to plaintiffs—and as explained *supra* Part II, that is exactly what the District Court did in this case.  And in any event, to the extent there is any

### A. Courts Properly Weigh and Balance Facts to Grant Summary Judgment Under Balancing Tests Like *Glatt*.

FLSA employment status is ultimately a question of law, *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988), which always turns on the overall economic reality of the parties' relationship, *Velez*, 693 F.3d at 326-27, 330. Courts apply flexible multi-factor balancing tests like *Glatt* to analyze the economic reality of a wide variety of purported employment relationships. *See Velez*, 693 F.3d at 326-27, 330 (identifying different multi-factor tests). Application of any of these tests will necessarily involve some assessment of the "existence and degree" of each factor by weighing the underlying facts—indeed, the *Glatt* test "requires ***courts to weigh*** a diverse set of benefits . . . ." 811 F.3d at 536 (emphasis added). If this weighing were verboten on summary judgment, as Appellants suggest, then courts could ***never*** resolve the ultimate legal question under these tests on summary judgment, even when all the underlying facts are undisputed.

But Appellants are wrong. This Court and others regularly weigh and balance undisputed facts, determine the existence and degree of relevant factors, and grant summary judgment to defendants under FLSA balancing tests—even when some facts and factors point towards employment. In *Meyer v. U.S. Tennis*

---

conflict between *Glatt*'s instruction to weigh facts and *Zheng*, *Glatt*—which deals with the exact question at issue in this case—controls.

*Ass'n*, 607 F. App'x 121 (2d Cir. 2015), for example, this Court affirmed summary

judgment for the defendant because plaintiffs were not FLSA employees under a

balancing test, "substantially for the reasons in [the district court's] thorough and

well-reasoned . . . opinion." *Id.* at 122-23. The district court had weighed facts to

determine the degree of each economic reality factor. *Meyer v. U.S. Tennis Ass'n*,

No. 1:11-cv-6268, 2014 WL 4495185, at *6-8 (S.D.N.Y. Sept. 11, 2014). For

instance, the court weighed facts relevant to a "degree of control" factor, and found

that the defendant "did have some degree of control over Plaintiffs . . . but [it] is

not so great as to weigh in favor of finding the Plaintiffs to be employees . . . ." *Id.*

at *7. While a second factor "cut[] both ways" and a third weighed in favor of an

employment relationship, when all the facts were analyzed "together in the context

of the economic realities test," the court held that the plaintiffs were not employees

as a matter of law. *Id.* at *7-8.

Meyer is not an outlier. Courts within and outside this Circuit regularly use

similar weighing and balancing analyses to grant summary judgment to FLSA

defendants based on multi-factor balancing tests, including *Glatt*. *See, e.g.*, *Kaplan

v. Code Blue Billing & Coding, Inc.*, No. 12-12011 et al., 2013 WL 238120, at *2-

3 (11th Cir. Jan. 22, 2013); *Reich v. Parker Fire Prot. Dist.*, 992 F.2d 1023, 1028

(10th Cir. 1993); *Mark*, 2016 WL 1271064, at *9-13; *Hollins*, 144 F. Supp. 3d at

- 50 -

998; *Saleem v. Corp. Transp. Grp. Ltd.*, 52 F. Supp. 3d 526, 539 (S.D.N.Y. 2014), *appeal filed*, No. 15-88 (2d Cir. Jan. 7, 2015).[48]

Even the cases Appellants rely upon show that summary judgment can and often should be granted based on multi-factor balancing tests. *See* Appellants' Br. 26-27. For instance, *Zheng*, 355 F.3d at 76-77, specifically contemplated summary judgment for defendants under a multi-factor balancing test, and noted that to do so, "the Court need not decide that ***every*** factor weighs against . . . employment." *Id.* at 76-77. And *Barfield*, 537 F.3d 132, and *Secretary of Labor v. Lauritzen*, 835 F.2d 1529 (7th Cir. 1987), ***affirmed*** grants of summary judgment (albeit to the plaintiffs) under multi-factor balancing tests.[49]

---

[48] *See also Vlad-Berindan v. N.Y.C. Metro. Transit Auth.*, No. 14-cv-10304, 2016 WL 1317700, at *7-8 (S.D.N.Y. Apr. 1, 2016) (dismissing FLSA claim under *Glatt* where allegations showed that some factors pointed towards employment). This Court also weighs and balances facts to determine the "existence" of factors under non-balancing FLSA cases. *See, e.g.*, *Pippins*, 759 F.3d at 243-49 (weighing and balancing facts to determine existence of the "advance knowledge" prong of the test for the learned professional exemption to overtime benefits under the FLSA, and granting summary judgment for defendant); *Brown*, 755 F.3d at 165-69 (weighing and balancing facts, including at least one "objective fact weighing . . . strongly in [the plaintiff's] favor" to determine, among other things, whether plaintiff reasonably expected or received compensation from the defendant, and granting summary judgment for defendant).

[49] Appellants' citation (Appellants' Br. 27 n.62) to *Hana Financial, Inc. v. Hana Bank*, 135 S. Ct. 907 (2015), is misplaced. There, the Supreme Court explained that a jury is the proper decision-maker "***when the facts warrant neither summary judgment*** nor judgment as a matter of law," ***and*** "when the relevant question is how an ordinary person or community would make an assessment," because that assessment "falls comfortably within the ken of a jury." *Id.* at 911,

Moreover, Appellants' focus on courts' findings as to the "existence and degree" of the factors fundamentally misunderstands the role of multi-factor balancing tests in determining economic reality. The factors in each of these tests serve as flexible, non-mandatory, and non-exhaustive guideposts designed to aid the court in evaluating the nature of the parties' relationship. *See Velez*, 693 F.3d at 326, 329-30; *Solis*, 642 F.3d at 522; *Glatt*, 811 F.3d at 537. They inform, but do not supplant, the ultimate legal question of the economic reality of the parties' relationship based on the totality of the ***underlying facts***. *Id.* Accordingly, summary judgment is appropriate under *Glatt* and other balancing tests when, as here, the undisputed underlying facts lead to only one conclusion about the parties' economic reality—regardless of whether and how the court may have evaluated the existence and degree of some non-mandatory factors in understanding the significance of those facts. *Cf. Meyer*, 2014 WL 449185, at *8; *see supra* Part II.

### B. Summary Judgment Is Necessary to Avoid Unworkable Trials and Protect *Bona Fide* Internship Programs.

If summary judgment were unavailable under *Glatt* even for straightforward academic internships such as these, then ***every*** unpaid internship case would go to trial, resulting in strains on the judicial system, creating a lack of predictability for interns and host companies alike, and threatening even the *bona fide* internships

---

913 (emphasis added). Here, the facts ***do*** warrant summary judgment, the *Glatt* test does not include an "ordinary person" standard, and second-guessing the judgment of educational institutions is decidedly ***not*** within the ken of a jury.

*Glatt* was designed to protect.[50]  There would be no judicial opinions setting the

contours of a *bona fide* internship as a matter of law.  Instead, each individual

internship would be the subject of protracted litigation many times longer than the

internship itself, culminating in a trial years after the fact in which jurors would

reevaluate the schools' judgments of educational value of internships approved for

credit and insert themselves into a magazine's hour-by-hour operations.  And if

those jurors were to apply Appellants' misreading of *Glatt*, the trial would be

particularly intensive, examining whether each task performed was sufficiently

"educational" to allow an intern to participate, looking at the intern's subjective

assessment of whether he or she was learning during the entirety of the internship,

and awarding wages for any minute in which the intern did not believe he or she

was being educated.  *See supra* Part II; Appellants' Br. 31, 41.[51]

---

[50] Appellants have it backwards when they claim that the District Court's interpretation of *Glatt* renders it "hard to imagine any circumstance in which an unpaid intern could get to trial."  Appellants' Br. 2.  In fact it is easy—one only needs to look at the interns at issue in *Glatt* itself, who worked internships that were not school-sanctioned and lasted far longer than a single school semester. *See Glatt*, 811 F.3d at 532.  On the other hand, both Appellants' and their *amici*'s briefs omit any description of what a legal internship under *Glatt* could look like (besides a thesis seminar or law school clinic).

[51] This process would be akin to a jury awarding college students back their tuition for any portion of a course in which they believe they did not learn enough. The absurdities are obvious, and thus the legal system does not get to reevaluate a school's judgment that an entire semester of a course is educationally valuable. *See Regents of Univ. of Mich.*, 474 U.S. at 225.

Under such a system, federal courts' dockets would be chock-full of unpaid intern cases,[52] host companies would be unable to design a legal internship program *ex ante* or rely on school's academic judgments as to educational value, much less on interns' representations and stated expectations, and interns and host companies alike would spend significant time and resources in unpredictable litigation. The strains on parties and the judicial system would be untenable and, in the long term, would create a chilling effect that would threaten to bring about the end of unpaid internships altogether. *Cf.* ACE Br. at 29-30. But this Court and others have recognized that these internships "can greatly benefit interns," *Glatt*, 811 F.3d at 535; *see also Schumann*, 803 F.3d at 1211 ("modern internships can play an important—indeed critical—role in preparing students for their chosen careers"). As the colleges and universities that provide academic credit for unpaid internships recognize, "education outside the classroom is important to prepare students to be productive citizens and competent employees," and students pursue internships precisely "because of the benefit they derive from reinforcing their knowledge and skills in actual workplace settings." (No. 13-4480, ECF No. 138 at 17.)

---

[52] Currently, unpaid internships are extremely common in the private sector. *See* ACE Br. 17, 21 (estimating 1-2 million internships each year), 22 (noting that students are pursuing internships in "record numbers").

- 54 -

In other words, the policies animating *Glatt* require that it be applied on summary judgment where the totality of the circumstances admit only one conclusion on the ultimate legal question.

## <u>CONCLUSION</u>

For the reasons discussed above, the District Court's grant of summary judgment for Hearst should be affirmed.

Dated:  April 7, 2017                     Respectfully submitted,


<u>/s/ Jonathan R. Donnellan</u>
Eve Burton
Jonathan R. Donnellan
Kristina E. Findikyan
Jennifer D. Bishop
Hearst Corporation
300 West 57th Street
New York, New York 10019
(212) 841-7000

*Counsel for Defendant-Appellee*
*The Hearst Corporation*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.      This brief complies with the type-volume limitation of Fed. R.

App. P. 32(a)(7)(B) because this brief contains 12,853 words, excluding the parts

of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This count is from the

word-count function of Microsoft Word.

2.      This brief complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)

because this brief has been prepared in a proportionally spaced typeface using

Microsoft Word 2010 in 14-point Times New Roman font.


Dated:  April 7, 2017                              /s/ Jonathan R. Donnellan_____

                                                  Jonathan R. Donnellan
                                                  HEARST CORPORATION
                                                  300 West 57th Street
                                                  New York, New York 10019
                                                  Phone:  (212) 841-7000
                                                  jdonnellan@hearst.com

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this 7th day of April, 2017, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ Jonathan R. Donnellan

Jonathan R. Donnellan
HEARST CORPORATION
300 West 57th Street
New York, New York 10019
Phone:  (212) 841-7000
jdonnellan@hearst.com

- 57 -